**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

8:26cv2230-KKM-NHA

ANGIE L. BOONE,
Plaintiff,
v. Case No.: (to be assigned by the Clerk)
CHAD CHRONISTER, in his official capacity as SHERIFF OF HILLSBOROUGH COUNTY, FLORIDA, sued as and on behalf of the HILLSBOROUGH COUNTY SHERIFF'S OFFICE and its PROFESSIONAL STANDARDS BUREAU;
DEPUTY DEENA BILAND, individually;
DEPUTY LASALLE, individually;
CORPORAL KRISTIN HENDRICKS #249576, individually;
DEPUTY JANE DOE J-2, individually;
DEPUTIES JOHN AND JANE DOES 1 THROUGH 6, individually;
DEPUTY JANE DOE 7, individually;
DEPUTIES JOHN AND JANE DOES 8 AND 9, individually;
SERGEANT JOHN DOE, individually;
PATROL SUPERVISOR JOHN OR JANE DOE, individually;
PROFESSIONAL STANDARDS SUPERVISOR JOHN OR JANE DOE, individually;
RECORDS CUSTODIAN JANE DOE, individually; and RECORDS SUPERVISOR JOHN OR JANE DOE, individually,
Defendants.

AUG 3 2026 AM11:25
FILED - USDC - FLMD - TPA

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, ANGIE L. BOONE, sues Defendants CHAD CHRONISTER, in his official capacity as Sheriff of Hillsborough County, Florida; DEPUTY DEENA BILAND; DEPUTY LASALLE; CORPORAL KRISTIN HENDRICKS #249576; DEPUTY JANE DOE J-2; DEPUTIES JOHN AND JANE DOES 1 THROUGH 6; DEPUTY JANE DOE 7; DEPUTIES JOHN AND JANE DOES 8 AND 9; SERGEANT JOHN DOE; PATROL SUPERVISOR JOHN OR JANE DOE; PROFESSIONAL STANDARDS SUPERVISOR JOHN OR JANE DOE; RECORDS CUSTODIAN JANE DOE; and RECORDS SUPERVISOR JOHN OR JANE DOE, and alleges as follows.

**STATEMENT OF THE PLAINTIFF'S POSITION**

Plaintiff states the following at the outset, so that nothing in the pages that follow is mistaken for hostility toward law enforcement, toward the courts, or toward the institutions of this country.

Plaintiff respects the law and the people who enforce it. She comes from a family that has served. Three of her relatives are serving in the United States military at present, and three more served before them. A niece of hers serves as a police officer in another city. A great-uncle served as a firefighter in Ybor City. Service runs through generations of Plaintiff's family, and she was raised to regard it as work worth doing.

IFP

Plaintiff supports the office of the Sheriff, supports the police, supports the military, and supports the courts. She abides by the law and does her best to follow every rule that applies to her. Where she has fallen short of that in some ordinary way, she has answered for it. She believes in the system and in the process, and she has brought this case through the process rather than around it.

Plaintiff called the Hillsborough County Sheriff's Office four times on August 4, 2023 because she believed deputies would help her. She would call again tomorrow if she needed help. Her complaint is not with policing, it is not with the Hillsborough County Sheriff's Office as an institution, and it is not with the many deputies who do this work honorably and at real cost to themselves.

What Plaintiff brings to this Court is the conduct of particular individuals on particular dates, and the response of one bureau to one complaint. That is the whole of this action, and she asks for nothing beyond it.

Plaintiff asks that the pages that follow be read with this stated at the front, so that the respect she holds for this Court and for the institutions involved is understood as a fact about her rather than as a formality of address.

## PRELIMINARY STATEMENT

This case is about a body of evidence that a law enforcement agency told a citizen it had thoroughly reviewed, and then told her had never existed.

It is an action under 42 U.S.C. §§ 1983, 1985, and 1986 for the deprivation of rights secured by the First, Fourth, Fifth, and Fourteenth Amendments; under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act; and for sanctions for the destruction of evidence under Fed. R. Civ. P. 37(e).

On August 4, 2023, Angie Boone was beaten inside her own place of business after calling the Hillsborough County Sheriff's Office four times for help. She had told the responding deputies that she was ill, that she had recently spent close to a week hospitalized for a life-threatening condition, and that she had undergone two procedures. Six deputies came out together, on four separate occasions. Not one of them wrote a report. The only report in the agency's file was written by a deputy who was not there.

While Boone lay strapped to an ambulance gurney with a traumatic brain injury, a deputy searched her locked vehicle and her purse without a warrant and over her refusal, and her transport to the hospital was held so that the search could be completed. Deputies ordered her out of her own leased premises, refused to let her lock the doors, and left the woman who had just beaten her in possession of the building. Deputies were twice represented to be coming to the hospital to take her statement. None came. No statement was ever taken from her.

Boone did not learn that no reports had been written until July 14, 2026. She learned it from the agency itself, in the same letter in which the Professional Standards Bureau told her that a thorough review of body-worn camera footage across all four calls had been completed, that findings had been documented for each, and that her complaint was unfounded. On July 15, 2026, it told her the footage does not exist. On July 20, 2026, its investigator telephoned rather than write, refused to communicate in writing at all, refused Boone's request for a disability accommodation on the ground that Boone did not need one, refused to accept Boone's audio recordings of the incident, identified no appeal, and stated that there was no way she would reopen the file.

Boone asked for that footage to be kept in August 2023. Days after the incident she told a supervising sergeant, by telephone, that deputies had searched her vehicle without her consent while she was injured and had stood by while her assailant screamed over her, and she asked him to preserve the body-worn camera recordings because she was too unwell to pursue the matter then and intended to return to it when she recovered. He told her he had reviewed everything and would do nothing further. In the same period a deputy told Boone that her body-worn camera had been recording and that she had noted its activation in the agency's records.

At least seven body-worn camera recordings were destroyed after Boone had requested them. The agency's only stated justification was the expiration of a two-year limitations period for simple battery. The injuries its own personnel watched her carried out on a gurney describe a felony carrying a three-year period that has not yet run.

Plaintiff did not set out to bring a civil rights case. She filed one complaint with one bureau, asking why deputies who came to her business four times had not done their jobs. What followed — the written representation that evidence had been thoroughly reviewed, the statement one day later that the evidence does not exist, the refusal to communicate in writing, the denial of a disability accommodation on the ground that she did not need one, and the closure of the file with no appeal and no person to appeal to — is the agency's own contribution

to this action. A substantial part of what is pleaded here did not exist until the Sheriff's Office answered her complaint.

This action seeks compensatory and punitive damages, declaratory and injunctive relief, and sanctions for the destruction of evidence. Plaintiff demands trial by jury.

## I. NATURE OF THE ACTION

1. On August 4, 2023, Angie Boone was beaten inside her own place of business at 8428 West Waters Avenue, Tampa, Florida. Two physicians later told her she was lucky to be alive. She sustained facial fractures consistent with blunt force trauma, bilateral periorbital hematoma, and a traumatic brain injury. She lost six months of her memory. She could not drive. She could not work. She lost her business.

2. Deputies of the Hillsborough County Sheriff's Office came to Plaintiff's business four separate times that day, in response to four separate calls for service. Six deputies attended those responses. Not one deputy who was physically present on any of the four occasions wrote a report.

3. The single report that exists was written by a deputy who was not there and who witnessed none of it. It records secondhand statements. It attributes to Boone the conduct of the woman who attacked her. It is false.

4. While Boone lay strapped to an emergency medical services gurney with an untreated head injury, Deputy Jane Doe J-2 searched her locked vehicle and her purse. There was no warrant. There was no probable cause. There was no exigency. Boone said no. The search was conducted anyway, and Boone's transport to the hospital was held so that the search could be completed.

5. Deputies ordered Boone out of her own leased commercial premises. They refused to permit her to lock her doors. They surrendered physical control of her building, her equipment, and her business records to the woman who had just assaulted her. No court had entered a writ of possession. No eviction had been filed. No judicial process of any kind preceded that dispossession.

6. Boone's attacker stood over her, followed her, and screamed at her while Boone was physically restrained on the gurney, in the presence of six deputies. Not one of them intervened.

Instead, deputies scolded and mocked Boone, telling her to "grow up" and that "if you're afraid of sharks, don't go into the water."

7. Boone called 911 four times that day asking for help. The deputies who answered those calls berated her for calling.

8. On July 14, 2026, the Hillsborough County Sheriff's Office, through Corporal Kristin Hendricks of the Professional Standards Bureau, informed Boone in writing that "[a] thorough review of BWC and photographs was completed," that each of the four calls had been reviewed, that findings had been documented for each call, and that her complaint was unfounded.

9. On July 15, 2026 — one day later — the same investigator informed Boone in writing that "there is no longer body worn camera videos associated to the calls."

10. Both statements cannot be true. Either the agency reviewed footage that it now says does not exist, or it issued a finding of no misconduct on the basis of no evidence at all and told Boone otherwise.

11. At least seven body-worn camera recordings, together with computer-aided dispatch records and related digital evidence, were destroyed, purged, or permitted to be overwritten after Boone had already requested them and after the Sheriff's Office had actual notice of her request. The Sheriff's Office has affirmatively refused to attempt recovery from archives, backups, cloud storage, or evidence-system audit trails, and has refused to identify when the recordings were deleted, under what retention authority, or by whom.

12. When Boone asked — in writing on July 15, 2026, and again by telephone on July 20, 2026 — that the agency communicate with her in writing as a disability accommodation, the assigned investigator refused. She told Boone that Boone had "no communication problems at all." She refused to identify an ADA coordinator. She refused to identify any accommodation process. She refused to escalate the matter to any other person. She refused to confirm the closure of the file in writing. She refused to accept Boone's audio recordings of the incident. And she stated that she would not reopen the file under any circumstances.

13. This action is brought under 42 U.S.C. §§ 1983, 1985(3), 1986, and 1988; Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Plaintiff seeks compensatory and punitive damages,

declaratory relief, injunctive relief, evidentiary sanctions for the spoliation of evidence, and costs.

## II. JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

15. This Court has jurisdiction under 28 U.S.C. § 1343(a)(3) and (a)(4) to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States and by Acts of Congress providing for the protection of civil rights.

16. This Court has jurisdiction over Plaintiff's claims under Title II of the Americans with Disabilities Act pursuant to 42 U.S.C. § 12133 and 28 U.S.C. § 1331, and over Plaintiff's claim under Section 504 of the Rehabilitation Act pursuant to 29 U.S.C. § 794a.

17. This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202, and injunctive relief under Rule 65 of the Federal Rules of Civil Procedure.

18. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over any claim arising under Florida law that forms part of the same case or controversy.

19. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because all of the events and omissions giving rise to these claims occurred in Hillsborough County, Florida, and under 28 U.S.C. § 1391(b)(1) because all Defendants reside in this District.

20. Assignment to the Tampa Division is proper because the events occurred in Hillsborough County and all parties reside in Hillsborough County.

## III. PARTIES

21. Plaintiff ANGIE L. BOONE is a natural person, a citizen of the United States, and a resident of Hillsborough County, Florida. At all times material she was the lawful leaseholder and operator of a licensed business located at 8428 West Waters Avenue, Tampa, Florida. She is a qualified individual with a disability within the meaning of 42 U.S.C. § 12131(2) and 29 U.S.C. § 705(20).

22. Defendant CHAD CHRONISTER is sued in his official capacity as the Sheriff of Hillsborough County, Florida. He is the final policymaking authority for the Hillsborough County Sheriff's

Office with respect to the training, supervision, discipline, and conduct of its deputies; the retention, preservation, and destruction of body-worn camera recordings and other evidence; the operation of the Professional Standards Bureau; and the agency's compliance with the Americans with Disabilities Act. The Hillsborough County Sheriff's Office is a public entity within the meaning of 42 U.S.C. § 12131(1) and a recipient of federal financial assistance within the meaning of 29 U.S.C. § 794.

23. Plaintiff asserts her claims against the Hillsborough County Sheriff's Office as an institution and against its Professional Standards Bureau as a distinct operating bureau of that institution. Under Florida law the Sheriff in his official capacity is the legal designation through which claims against the Office are brought, and Defendant Chronister is named in that capacity for that purpose. To the extent this Court determines that the Hillsborough County Sheriff's Office or its Professional Standards Bureau is separately amenable to suit, each is named as a Defendant and Plaintiff asserts every claim in this Complaint against each directly.

24. The Professional Standards Bureau is not merely a subdivision that happens to have handled Plaintiff's complaint. It is the sole internal mechanism by which the Hillsborough County Sheriff's Office reviews the conduct of its own deputies. It holds distinct duties, distinct records, distinct policies, and distinct authority. Its failures in this matter are separate in time, separate in personnel, and separate in kind from the failures of the deputies who responded on August 4, 2023, and Plaintiff pleads them as separate wrongs.

25. Defendant DEPUTY DEENA BILAND was at all material times a sworn deputy employed by the Hillsborough County Sheriff's Office, acting under color of state law. She authored the sole written report generated from the events of August 4, 2023, designated GOH HS 2023-808016. She was not present for the assault and witnessed none of the conduct she recorded. Her report is inaccurate and false.

26. Deputy Biland is no longer employed by the Hillsborough County Sheriff's Office. She is sued in her individual capacity for conduct she committed while acting under color of state law, and her separation from the agency neither extinguishes that liability nor transfers it to the agency. Because her conduct was in bad faith, with malicious purpose, and in wanton and willful disregard of Plaintiff's rights, Fla. Stat. § 768.28(9)(a) removes the government from between her and any judgment. She answers as a person, and any judgment entered against her runs against her personally and against her personal assets.

27. Defendant DEPUTY LASALLE was at all material times a sworn deputy employed by the Hillsborough County Sheriff's Office, acting under color of state law. Deputy LaSalle responded to the premises on August 4, 2023 and is sued in his or her individual capacity.

28. Defendant CORPORAL KRISTIN HENDRICKS #249576 is a sworn member of the Hillsborough County Sheriff's Office assigned to the Professional Standards Bureau, acting under color of state law. She was the investigator assigned to Professional Standards Complaint Reference ID 01KX7R4DJ8-QZM5JWZP-TYAQWW9N. She is sued in her individual capacity.

29. Defendant DEPUTY JANE DOE J-2 was at all material times a sworn deputy employed by the Hillsborough County Sheriff's Office, acting under color of state law. She conducted the warrantless search of Plaintiff's locked vehicle and purse on August 4, 2023 and coordinated with the unauthorized occupant of Plaintiff's premises. Defendant Deputy Jane Doe J-2 is one of the six deputies who responded on August 4, 2023 and is separately designated here only because she is identified by specific conduct rather than by her presence. She is not an additional person, and Plaintiff does not contend that a seventh deputy attended the scene. Her true identity is known to Defendant Chronister, is recorded in records within the exclusive custody and control of the Hillsborough County Sheriff's Office, and has been withheld from Plaintiff notwithstanding repeated written requests. She is sued in her individual capacity and will be substituted by name upon identification.

30. Defendants DEPUTIES JOHN AND JANE DOES 1 THROUGH 6 were at all material times sworn deputies employed by the Hillsborough County Sheriff's Office, acting under color of state law, who responded to one or more of the four calls for service at Plaintiff's business on August 4, 2023. Their true identities are known to Defendant Chronister, are recorded in computer-aided dispatch, mobile data terminal, automatic vehicle location, radio, and payroll records within the exclusive custody and control of the Hillsborough County Sheriff's Office, and have been withheld from Plaintiff notwithstanding repeated written requests. They are sued in their individual capacities and will be substituted by name upon identification.

31. Defendant PATROL SUPERVISOR JOHN OR JANE DOE was at all material times a supervisory sworn member of the Hillsborough County Sheriff's Office, acting under color of state law, who was consulted by Defendant Deputy Deena Biland concerning the arrest of Jessica Torres Figueroa and who directed that no arrest be made. This Defendant's identity is

known to Defendant Chronister and has been withheld from Plaintiff. This Defendant is sued in his or her individual capacity and will be substituted by name upon identification.

32. Defendant SERGEANT JOHN DOE was at all material times a supervisory sworn member of the Hillsborough County Sheriff's Office, acting under color of state law, who spoke with Plaintiff by telephone on or about August 5, 2023 concerning the conduct of the responding deputies and the condition of the records. His true identity is known to Defendant Chronister and has been withheld from Plaintiff. He is sued in his individual capacity and will be substituted by name upon identification.

33. Defendant DEPUTY JANE DOE 7 was at all material times a sworn deputy employed by the Hillsborough County Sheriff's Office, acting under color of state law. She was the second of the two female deputies who came to see Plaintiff on or about August 5 or August 7, 2023, neither of whom had been present at the scene on August 4. Plaintiff cannot presently fix which of those two dates, because the traumatic brain injury inflicted on August 4, 2023 destroyed her memory of the period, and the Sheriff's Office has refused to produce the records that would fix it. She is sued in her individual capacity.

34. Defendants DEPUTIES JOHN AND JANE DOES 8 AND 9 are the deputies, if any were in fact assigned, who were dispatched, assigned, or represented to be en route to interview Plaintiff at the hospital on August 4, 2023 and who never appeared. Plaintiff was twice told deputies were coming and no deputy came. Whether any deputy was actually assigned, and whether that deputy was among the six who had already responded, are facts recorded in the agency's dispatch records and known to Defendants alone. Plaintiff designates them fictitiously to preserve the claim and does not contend that they are necessarily additional persons. They are sued in their individual capacities.

35. Defendant PROFESSIONAL STANDARDS SUPERVISOR JOHN OR JANE DOE was at all material times the supervising member of the Professional Standards Bureau who reviewed, approved, ratified, or authorized the disposition of Professional Standards Complaint Reference ID 01KX7R4DJ8-QZM5JWZP-TYAQWW9N, including the classification of Plaintiff's complaint as unfounded, the decision not to reopen it, and the decision to refuse Plaintiff written communication. An internal affairs disposition of this kind is not issued on an investigator's sole authority. This Defendant is sued in his or her individual capacity.

36. Defendant RECORDS CUSTODIAN JANE DOE was at all material times an employee of the Hillsborough County Sheriff's Office assigned to the unit responsible for body-worn camera records, acting under color of state law. She took Plaintiff's telephone call before Plaintiff filed any Professional Standards complaint, spoke with Plaintiff directly, was asked by Plaintiff to forward the matter up the chain of command, was told by Plaintiff that Plaintiff had already requested an escalation process, undertook to consult her supervisor, and thereafter stated that no video or camera footage existed. She is sued in her individual capacity.

37. Defendant RECORDS SUPERVISOR JOHN OR JANE DOE was at all material times the supervisor consulted by Defendant Records Custodian Jane Doe concerning Plaintiff's request, and the person to whom Plaintiff's escalation request was to be carried. This Defendant is sued in his or her individual capacity.

38. Plaintiff has repeatedly and in writing requested that the Hillsborough County Sheriff's Office identify every deputy, supervisor, dispatcher, and records employee involved in the events of August 4, 2023 and in the subsequent Professional Standards investigation. The Sheriff's Office has refused. The use of fictitious designations in this Complaint is the direct result of that refusal, and Plaintiff reserves the right to amend under Rule 15 upon disclosure.

39. At all times material, each individual Defendant acted under color of the statutes, ordinances, regulations, customs, and usages of the State of Florida and the Hillsborough County Sheriff's Office, and within the course and scope of employment.

40. At all times material, each individual Defendant acted in bad faith, with malicious purpose, and in a manner exhibiting wanton and willful disregard of Plaintiff's human rights, safety, and property, within the meaning of Fla. Stat. § 768.28(9)(a).

41. Every individual Defendant named in this Complaint is sued as a person. Each is named in his or her individual capacity. Each made choices. A person acting under color of office remains the person who acted. Fla. Stat. § 768.28(9)(a) reflects that principle in Florida law: once an officer crosses from error into bad faith, malicious purpose, or wanton and willful disregard, the government steps out from between that officer and the person he or she harmed, and the officer answers personally and as to personal assets.

42. The conduct at issue here consisted overwhelmingly of things these Defendants did not do. Deputies attended four separate calls for service and none of them wrote a report. Deputies watched a woman scream at an injured person strapped to a gurney and none intervened. A

supervisor was told what had happened and documented nothing. Deputies were represented to be coming to a hospital and never came. An internal affairs investigator was handed a contradiction in her own agency's file and closed it. Not one person in this chain reported anything upward, outward, or to anyone at all.

43. Plaintiff does not plead what pressures, expectations, or institutional incentives may have operated on any individual Defendant, because she does not know them. She pleads that each Defendant retained the capacity to write a report, to answer an email, to preserve a recording, to say something to a supervisor, or to intervene, and that each declined. Those were personal decisions with a person on the other end of them, and Plaintiff, nearly three years later, is still living inside their result.

## IV. STATEMENT OF FACTS

### A. The Business and the Assailant

44. Plaintiff operated a licensed salon business at 8428 West Waters Avenue, Tampa, Florida, under a valid commercial lease. She was the lawful leaseholder in actual possession of the premises.

45. Jessica Torres Figueroa was a former employee of Plaintiff's business. She held no lease, no ownership interest, no tenancy, and no legal right to possession of the premises.

46. On August 4, 2023, Plaintiff placed a call for service to the Hillsborough County Sheriff's Office concerning Torres Figueroa's presence at and refusal to leave the business.

### B. The Four Calls for Service

47. Four separate calls for service were generated at Plaintiff's business on August 4, 2023. Those calls are recorded in the Sheriff's computer-aided dispatch system as HS 2023-799627, HS 2023-799703, and HS 2023-799828, and in a related record designated HCSO 2023-779627.

48. Six deputies came to Plaintiff's business on August 4, 2023. They came out together, as a group, and the same group came out on four separate occasions in response to four separate calls for service. Plaintiff does not allege that twenty-four separate deputies attended. She alleges that six deputies attended four times.

49. Plaintiff was not permitted to go outside on every occasion that deputies responded. On at least one call she was directed not to go outside because Jessica Torres Figueroa was outside. Plaintiff therefore observed six deputies, and there may have been additional deputies present whom she did not see. The Hillsborough County Sheriff's Office knows exactly how many personnel it dispatched to each of the four calls and has refused to tell her. Plaintiff names those she observed as Defendants Deputies John and Jane Does 1 through 6, and will seek leave to add any additional responding personnel upon their identification in discovery.

50. On the initial call, responding deputies did not remove the unauthorized occupant. Instead, deputies told Plaintiff — the lawful leaseholder — that she should leave her own place of business.

51. Deputies refused to permit Plaintiff to lock and secure her own commercial premises.

52. The reason deputies gave for declining to remove Torres Figueroa was that she held a key. Plaintiff attempted repeatedly to explain the circumstances of that key: it had been given for the limited purpose of painting, it conferred no tenancy and no right of possession, and it did not make its holder a lawful occupant entitled to remain over the objection of the leaseholder.

53. Deputies stopped Plaintiff from explaining this. They cut her off. They did not ask what the key was for, when it was given, or on what terms. They treated the bare fact of a key as dispositive of a question of commercial possession, and they treated their own conclusion as a reason to decline to act.

54. Deputies also permitted persons unknown to Plaintiff to be present inside her premises and to take part in removing property from it, and refused Plaintiff's requests to prevent that.

55. Deputies permitted Torres Figueroa to remain inside and around the premises, and surrendered physical access to and control of the building, its contents, its equipment, and its business records to her.

56. Deputies publicly scolded, mocked, and humiliated Plaintiff in the presence of Torres Figueroa, including by telling Plaintiff to "grow up" and that "if you're afraid of sharks, don't go into the water."

57. That conduct was witnessed by Torres Figueroa. It communicated to her that the deputies had aligned themselves against Plaintiff and that she would face no consequence. It emboldened her.

### C. Plaintiff's Physical Condition, Which She Told the Deputies About

58. Plaintiff was already seriously unwell on August 4, 2023, before any of the events at issue occurred.

59. She had recently spent close to a week hospitalized for a life-threatening condition that she survived. She had undergone two separate medical procedures. She had donated blood shortly before that day. She was weak, ill, and physically compromised.

60. Plaintiff told the responding deputies all of this, directly and in plain terms. She told them she was sick. She told them she was ill and did not feel well. She told them she had just come from giving blood. She told them she had spent nearly a week in the hospital, that what she had been through was life-threatening, and that she had survived it. She told them she had undergone two procedures.

61. The deputies therefore knew, from Plaintiff herself and before anything else happened, that the person in front of them was physically vulnerable, recently hospitalized, and not well.

62. With that knowledge, they ordered her out of her own place of business. They refused to allow her to lock and secure her own premises. They directed her movements at the scene, including directing her not to go outside on at least one occasion. They scolded and mocked her in the presence of the woman who then assaulted her, telling her to "grow up" and that "if you're afraid of sharks, don't go into the water." They left that woman in possession of the building.

63. A physically compromised person, in a weakened state, recently discharged from a hospital, is not similarly situated to a healthy person when officers strip her of the ability to secure her own premises and leave a hostile party in place. Defendants knew the difference because Plaintiff told them, and they proceeded anyway.

### D. What a Deputy Said to Torres Figueroa on His Way Out

64. Immediately before the assault, and as he was leaving the premises, one of the responding deputies addressed Torres Figueroa directly. He told her, in substance, to stop talking. He made a remark comparing their ages, stating that he was probably younger than she was.

65. Torres Figueroa is a woman then in her forties who works in the beauty industry. She had been arguing her position to the deputy. The remark told her to be quiet and drew attention to her age.

66. Plaintiff possesses an audio recording of the responding deputies' statements at the scene, including the statement that if Plaintiff was afraid of sharks she should not go into the water, and including the deputy's parting remarks to Torres Figueroa. Plaintiff offered her audio recordings to the Professional Standards Bureau on July 20, 2026. The investigator expressed no interest and never asked to hear them.

67. The deputy then left. Torres Figueroa assaulted Plaintiff shortly afterward.

68. Plaintiff does not plead that the deputy intended that result. She pleads the sequence: officers had been called to a dispute; a deputy demeaned and dismissed one of the two people in that dispute; he then walked out and left her alone in the building with the other; and the assault followed. Officers who inflame a volatile person and then withdraw have not left the situation as they found it.

**E. The Assault**

69. Torres Figueroa attacked Plaintiff inside Plaintiff's own place of business. The attack was intentional and deliberate.

70. Plaintiff told the deputies who responded afterward, at the scene, that Torres Figueroa had beaten her and had hit her. She said so plainly. The deputies questioned her at length, and she answered as well as she was able while confused, in pain, and suffering the head injury she had just sustained.

71. Plaintiff did not tell the deputies at the scene that she also possessed a separate audio recording. She did not think of it. She had just shown them video of the assault, she had told them she had been struck, and she understood from what she was told that an arrest would follow. She had no reason to believe that anything further would be required of her.

72. Immediately before it, Plaintiff was seated, unwell, quiet, and looking at her telephone while Torres Figueroa and her companions removed property. She was not moving about the salon. She was not confronting anyone. The persons who were animated, mobile, and vocal in that room were Torres Figueroa and her companions.

73. Plaintiff did not provoke the attack. Plaintiff said nothing to Torres Figueroa before it. Plaintiff did nothing to aggravate her. Torres Figueroa's husband was outside the premises at the time she attacked Plaintiff.

74. The assault occurred after, and as a direct and foreseeable consequence of, the responding deputies' conduct in ordering Plaintiff out of her own business, refusing to let her secure it, publicly berating her in front of her assailant, and leaving her assailant in place with the run of the premises.

75. One civilian was present inside the salon during these events: a client of Torres Figueroa, employed at the adjacent La Segunda, who was later interviewed by the Hillsborough County Sheriff's Office by telephone.

76. Before the assault, that person stood in the middle of Plaintiff's salon and told Plaintiff that she would call the police if she felt threatened by her. She sang, stomped her feet, and danced in an aggressive manner while looking directly at Plaintiff. Plaintiff, who was seated, ill, and looking at her telephone, did not engage. She shook her head and said she was recording.

77. That person was looking directly at Plaintiff before the assault, was looking directly at Plaintiff when Torres Figueroa began the assault, and moved toward Plaintiff during it, shouting at Torres Figueroa to stop.

78. In her later telephone interview, that person told the investigating deputy that she saw movement out of the corner of her eye. That account cannot be reconciled with her own conduct at the time. A person who catches motion peripherally does not simultaneously shout the assailant's name and an instruction to stop. Her contemporaneous shout is captured on Plaintiff's own recording and is described in the agency's own report.

79. The Hillsborough County Sheriff's Office took that person's account as given, by telephone, three days after the fact, without confronting the inconsistency between what she said she saw and what she is recorded doing.

80. The people who were outside the premises during the assault were never interviewed at all. No deputy took a statement from any of them. Those persons include individuals who observed Luis Sepulveda standing outside during the incident — an observation that cannot be reconciled with the account Mr. Sepulveda gave under oath, in which he places himself inside the salon moving furniture and watching Plaintiff fall.

81. No deputy took a statement from any person who observed Torres Figueroa standing over Plaintiff and screaming at her while Plaintiff was restrained on the gurney, although six deputies and emergency medical personnel were present for it.

82. The Hillsborough County Sheriff's Office interviewed three people about these events: Plaintiff's assailant, her assailant's husband, and her assailant's client. It interviewed no one else. Every person whose account would not have supported the conclusion the agency reached went unasked.

83. Plaintiff sustained facial bruising, bilateral black eyes, and a traumatic brain injury. She was removed from her own salon on a gurney. Two separate physicians subsequently told her she was fortunate to be alive.

**F. The Warrantless Search and the Delayed Transport**

84. Emergency medical services personnel placed Plaintiff on a gurney and physically restrained her for transport.

85. While Plaintiff was strapped to that gurney, suffering acute head trauma and in evident medical distress, Defendant Deputy Jane Doe J-2 entered and searched Plaintiff's locked private vehicle and searched Plaintiff's purse.

86. There was no warrant. There was no probable cause. There was no arrest and no search incident to arrest. There was no exigent circumstance. There was no inventory of an impounded vehicle. There was no consent — Plaintiff verbally and expressly refused.

87. Plaintiff's transport to the hospital was delayed while that search was conducted. Deputy Jane Doe J-2 intercepted and held the transport for that purpose.

88. Plaintiff was not free to leave, could not leave, and was not permitted to leave. She was physically restrained and under the effective control of the responding deputies for the duration of the search.

89. Other responding deputies observed the search and the delay of transport, had a realistic opportunity to intervene, and did not.

**G. Harassment of a Restrained Victim**

90. While Plaintiff was strapped to the EMS gurney with a head injury, Torres Figueroa stood over her, followed her, and screamed at her.

91. That conduct occurred in the direct presence of six deputies of the Hillsborough County Sheriff's Office.

92. No deputy intervened. No deputy separated Torres Figueroa from Plaintiff. No deputy took a statement from Plaintiff as the injured party. Deputy Jane Doe J-2 spent her presence at the scene coordinating with Torres Figueroa — the unauthorized occupant and the assailant — while declining to interview, speak with, or take a statement from Plaintiff, the lawful owner and the victim.

93. A deputy told Plaintiff at the scene that Torres Figueroa would be arrested. No arrest was made.

### H. The Hospital Interview That Never Happened

94. While emergency medical personnel were strapping Plaintiff to the gurney, Plaintiff was told that deputies were coming to the hospital to speak with her about the assault.

95. At the hospital, in the emergency department, Plaintiff was told again that deputies were coming. Hospital personnel had telephoned the Hillsborough County Sheriff's Office and were advised that deputies were en route.

96. Plaintiff waited in the emergency department. No deputy came. After a period she is unable to fix precisely, because of the head injury she had sustained that day, she asked hospital personnel to telephone the agency a second time. On that second call the agency stated that no deputies would be coming.

97. Plaintiff was, at that time, a victim of a battery that had caused a traumatic brain injury, lying in an emergency department, capable of being interviewed, and expecting the interview she had twice been promised. No statement was ever taken from her. No deputy ever asked her what happened.

98. The hospital personnel who placed those two telephone calls to the Hillsborough County Sheriff's Office, and who relayed the agency's answers to Plaintiff, are identifiable and are witnesses to what the agency said on each occasion. At least one of them had also cared for Plaintiff during her hospitalization the preceding week and is known to her.

99. The deputies who were dispatched, assigned, or represented to be en route to that interview, and who did not appear, are named in this action as Defendants Deputies John and Jane Does 8 and 9. Their identities, the dispatch record of their assignment, and the record of the agency's two communications with hospital personnel are in Defendants' exclusive possession.

100. On either August 5 or August 7, 2023 — Plaintiff cannot fix which, and states so rather than guess — two female deputies did come to see Plaintiff. Neither of them had been present at the scene on August 4, 2023. One of the two was Defendant Deputy Deena Biland. The second is named in this action as Defendant Deputy Jane Doe 7.

101. Deputy Biland told Plaintiff that she was going to go and arrest Jessica Torres Figueroa. That statement is one of the few things Plaintiff retains from a period she otherwise cannot recall. No arrest was made. Deputy Biland then authored GOH HS 2023-808016, the only report generated from these events, describing conduct she had not witnessed and inverting the incident against the person she had told she would arrest.

102. Plaintiff also spoke by telephone with a female deputy in this period. That deputy told Plaintiff that she had spoken with the supervisor, and that she had done everything she could. She told Plaintiff that she would write the most thorough report she was able to write. She told Plaintiff that her hands were tied, that she was limited in what she was permitted to do, and that she was not allowed to do much.

103. That deputy also told Plaintiff, deliberately and more than once, that her body-worn camera had been recording and that she had made a notation in her records that her body-worn camera was on. She made a point of ensuring that Plaintiff understood this.

104. Plaintiff pleads that statement as what it is: a sworn deputy of the Hillsborough County Sheriff's Office told the injured party, days after the incident, that body-worn camera footage of these events existed and that its existence had been documented in the agency's own records. Plaintiff draws no inference as to that deputy's reasons for telling her and asks the Court to draw none. She pleads the fact of the statement, which the agency's records will either corroborate or contradict.

105. The Hillsborough County Sheriff's Office has produced no report authored by Defendant Deputy Jane Doe 7, and Plaintiff has to this day received no report of any kind concerning any of these events.

106. The absence of reports has caused Plaintiff concrete and continuing harm beyond this action. Without an incident report from any deputy who was present, Plaintiff has no official record of the assault to support a civil action against the person who committed it. Plaintiff asked for the reports. A supervisor told her reports would exist. None do.

107. The absence of any interview of the victim is not a clerical gap. An agency that never asks the injured party what happened has ensured that the only account in its file is the account of persons who were not there and of the person who caused the injury.

**I. The Arrest a Supervisor Forbade**

108. Plaintiff recorded video on her cellular telephone during the events of August 4, 2023. That recording captures the assault. It ends at the moment it does because Plaintiff was using the same telephone to call 911 as she was being struck.

109. When deputies arrived after the assault, they took Plaintiff's telephone and played that video aloud so that their body-worn cameras would capture it. Multiple responding deputies did so, and multiple body-worn cameras recorded Plaintiff's video of the assault as it played. Deputy Biland later viewed the same video and recorded a portion of it into the agency's digital evidence system.

110. The Hillsborough County Sheriff's Office therefore held its own copies of Plaintiff's video of the assault, in at least two forms: embedded within the body-worn camera recordings of the deputies who played it, and within the file the investigating deputy uploaded to the agency's evidence system.

111. Plaintiff no longer possesses the original. She lost that telephone during the months following the injury, in the circumstances described in Section VI below. The recordings the Hillsborough County Sheriff's Office destroyed were, by the time of their destruction, the only surviving copies of the only video record of the assault.

112. The destruction of the body-worn camera recordings therefore did not merely destroy evidence of what the deputies did. It destroyed the evidence of what was done to Plaintiff, which the agency had captured with its own equipment, at the scene, on the day it happened.

113. After viewing it, Deputy Biland told Plaintiff that she was going to go and arrest Jessica Torres Figueroa. She said it as a matter of course. She observed aloud that Plaintiff had a black eye, and she photographed Plaintiff's right eye. She told Plaintiff she would telephone her afterward and that she would be writing a report.

114. Plaintiff was at that time in acute distress and asked Deputy Biland to repeat and confirm what she had said, because she was surprised by it. Deputy Biland confirmed it. A sworn

deputy, having examined the video evidence and photographed the injury, stated without qualification that she was going to make an arrest.

115. Plaintiff asked Deputy Biland to escalate the matter to a supervisor. Deputy Biland told her that she had already done so.

116. Deputy Biland then telephoned Plaintiff and told her that she was not allowed to make the arrest. When Plaintiff pointed out that Deputy Biland had said she was going to, Deputy Biland told her that after speaking with the supervisor she was not permitted to proceed, that the supervisor would not allow an arrest, and that the matter was out of her hands. She told Plaintiff she had also spoken with the deputies who had been on scene.

117. Deputy Biland also told Plaintiff that the civilian witness had given an explanation for having shouted the assailant's name and an instruction to stop, and that the explanation had been accepted. No one confronted that witness with the inconsistency between her explanation and her recorded conduct.

118. Deputy Biland further told Plaintiff that her hands were tied, that she was limited in what she was permitted to do, that she was not allowed to do much, and that she would write the most thorough report she was able to write.

119. Those statements are pleaded as spoken. Plaintiff does not ask this Court to infer anything from the deputy's tone or from what she may have wished to convey beyond her words.

120. The words themselves establish the following: a deputy examined the evidence, concluded an arrest was warranted, said so to the victim, sought supervisory authorization, and was refused. The decision not to arrest Jessica Torres Figueroa was not the judgment of the officer who reviewed the evidence. It was made above her, by a supervisor who had not reviewed it, and it was imposed on her over her stated intention.

121. That supervisor is named in this action as Defendant Patrol Supervisor John or Jane Doe. His or her identity, the record of the consultation, and any documentation of the decision are in Defendants' exclusive possession.

122. Deputy Biland interviewed three people: Jessica Torres Figueroa, her husband Luis Sepulveda, and her client, who had been present in the salon. She interviewed no one else. She did not interview the persons who had been outside. She entered no account from any responding deputy into the record beyond a single consultation with Deputy LaSalle.

123. The report that followed was written by the deputy who had been told she could not arrest, after she had been overruled by a supervisor who had not seen the evidence, and after she had spoken with the deputies whose conduct at the scene is the subject of this action.

**J. The Reporting Failure and the False Report**

124. Across all four responses, and as to every deputy who attended any of them, not one deputy who was physically present authored a report.

125. The only detailed report generated from the events of August 4, 2023 is GOH HS 2023-808016, authored by Defendant Deputy Deena Biland.

126. Deputy Biland was not present for the assault. She witnessed none of the conduct she recorded. Her report consists of what other persons told her.

127. The report is false. Among other defects, it inverts the narrative of the incident, attributing to Plaintiff the conduct actually exhibited by Torres Figueroa; it records no account from any person who was outside the premises; and it rests on the characterizations of persons adverse to Plaintiff, obtained days after the fact, without any interview of the persons whose accounts would have contradicted them.

128. The Hillsborough County Sheriff's Office has stated that the remaining three of the four calls "did not require a report written and were documented appropriately." It has never produced the computer-aided dispatch entries, call notes, dispatch records, supervisor documentation, or any other record purporting to constitute that documentation.

129. On or about August 5, 2023, Defendant Sergeant John Doe telephoned Plaintiff. Plaintiff described what the responding deputies had done and asked him to document her concerns. She also asked him, expressly, to keep and preserve the body-worn camera footage for her. She told him she was too unwell to pursue the matter then and that she intended to return to it when she recovered. He was told, in August 2023, that the recordings were wanted and why.

130. He told her he would save it. He said he would preserve the records and reports for her, and that she could obtain them through a public records request when she was able.

131. That was not merely notice. It was an affirmative undertaking by a supervisory member of the Hillsborough County Sheriff's Office, given to an injured citizen who had just told him she was too unwell to pursue the matter and was relying on his assurance in order to postpone it.

Plaintiff relied on it. She waited, as she had said she would, and returned when she was able. The evidence was gone.

132. That request and that assurance placed the Hillsborough County Sheriff's Office on notice of its obligation to preserve this evidence in August 2023, within days of the incident and years before any recording was destroyed.

133. Plaintiff told Defendant Sergeant John Doe, in that conversation, that she disagreed with every aspect of how the responding deputies had handled the matter. She told him she disagreed with their conduct. She told him that deputies had searched her vehicle without her consent, and had done so after she was already injured. She told him that deputies stood and watched while Torres Figueroa yelled and screamed over her as emergency medical personnel were carrying her out.

134. Defendant Sergeant John Doe therefore had actual knowledge, within days of the incident and from the injured party herself, of a warrantless search conducted without consent on an injured person, and of deputies observing the continued abuse of that person without intervening. Those are the constitutional violations pleaded in Counts I, II, and IX of this Complaint, and they were reported to a supervisor of the Hillsborough County Sheriff's Office in August 2023.

135. Defendant Sergeant John Doe told Plaintiff that he had reviewed everything and that he was not going to do anything further.

136. That statement is the first of two occasions on which the Hillsborough County Sheriff's Office told Plaintiff that a complete review had been conducted and that nothing was wrong. The second was the Professional Standards Bureau's letter of July 14, 2026. If Defendant Sergeant John Doe in fact reviewed everything in August 2023, the body-worn camera recordings existed at that time and he saw them, and the agency has never explained what he saw or where his review is recorded. No document memorializing any such review has ever been produced to Plaintiff.

137. Plaintiff told Defendant Sergeant John Doe that she disagreed with his findings and that she wished to complain about his review. He told her that she would have to file a formal complaint, and referred her to Internal Affairs. He told her she could submit a public records request. He told her that the only avenue available to her was to bring a civil action against the person who had assaulted her.

138. That advice was materially incomplete and it channeled Plaintiff away from every remedy that would have preserved her claims against the agency. A supervisor who is told that deputies conducted a warrantless search of an injured citizen does not discharge his obligations by directing that citizen to sue her assailant.

139. Plaintiff did not then know, and had no way of knowing, what reports had or had not been written; she had seen no report and had been given none. Defendant Sergeant John Doe created no report, memorandum, or other record of the call. He did not secure the body-worn camera evidence. He did not initiate any review of the deputies' conduct that has ever been disclosed.

140. Plaintiff recounted this conversation to other people at the time and in the period afterward, which is why it remains among the events she is able to recall from a period she otherwise cannot.

141. Plaintiff did not know any of the foregoing until July 14, 2026. Between August 2023 and that date she had never been given a report, had never been told that no reports existed, and had never been told who had responded. She had requested records and received nothing. A citizen has no means of auditing whether a sheriff's deputy wrote a report, and no reason to assume that six deputies attending four calls in a single day had written none.

142. Plaintiff learned that fact on July 14, 2026, from the Hillsborough County Sheriff's Office itself, when the Professional Standards Bureau wrote to her that three of the four calls had required no report and identified a single report by a deputy who had not been present. That was twenty days before this Complaint was filed.

### K. The Records That Do Not Match Each Other

143. The Hillsborough County Sheriff's Office operates an emergency communications function that generates its own contemporaneous record of every call for service: the time a call is received, what the caller reports, what is dispatched, which units are assigned, when each unit arrives and clears, and what each unit reports back. Those records are created by call-takers and dispatchers, not by the responding deputies, and they are created in real time.

144. The narrative account produced by the Hillsborough County Sheriff's Office does not match its own computer-aided dispatch and emergency communications records. The account of what Plaintiff reported, of what occurred, of who was present, and of what the responding units did is

inconsistent with the contemporaneous entries generated by the agency's own communications personnel across calls HS 2023-799627, HS 2023-799703, and HS 2023-799828.

145. No one at the Hillsborough County Sheriff's Office has reconciled those discrepancies. No one has interviewed the call-takers or dispatchers who created the contemporaneous entries. The Professional Standards Bureau did not do so before classifying Plaintiff's complaint as unfounded, and its investigator stated that she would not reopen the file to do so.

146. Emergency communications records exist that the Hillsborough County Sheriff's Office has never produced to Plaintiff. Those include the record of a call placed to 911 on August 4, 2023 by Luis Sepulveda; the dispatch record generated when Plaintiff was transported from her business to the hospital; and the dispatch record generated in connection with the deputies who came to see Plaintiff days later. Each was created by the agency's own communications personnel and each remains in its possession.

147. Those records matter because they are the only contemporaneous account of these events created by anyone with no stake in them. The call-takers and dispatchers recorded what was reported to them as it was reported. The narrative later assembled by the agency does not match what those records show.

148. No one at the Hillsborough County Sheriff's Office has investigated whether any responding deputy, supervisor, dispatcher, or records employee had any personal, familial, social, or prior professional relationship with Jessica Torres Figueroa. Plaintiff raised the conduct of the responding deputies directly with a supervising sergeant on August 5, 2023 and again through a formal complaint in 2026. The question has never been asked.

**L. The Preservation Requests and the Destruction of Evidence**

149. Plaintiff requested body-worn camera footage and related records from the Hillsborough County Sheriff's Office through the agency's public records process.

150. She went in person to collect them. The records employee handed her a file that was nearly empty. When Plaintiff asked where the reports were, she was told there were none.

151. Plaintiff explained what had happened. The employee told Plaintiff she was shocked, told her she was sending the matter upward to Internal Affairs, and gave Plaintiff the telephone number for the Professional Standards Bureau. Other employees present observed the exchange.

152. A records employee of the Hillsborough County Sheriff's Office, on being told that four calls for service had produced no reports, recognized that as abnormal and escalated it on her own initiative. That is the response the agency's own supervisors and investigators did not have.

153. Before filing any Professional Standards complaint, Plaintiff telephoned the Sheriff's body-worn camera records unit and spoke with the employee named in this action as Defendant Records Custodian Jane Doe. Plaintiff expressly requested the formal process for locating, restoring, reactivating, recovering, or escalating the missing footage to the agency's digital-evidence, computer-forensic, or information-technology personnel. She stated that the communication was intended as a formal request for recovery and escalation.

154. Plaintiff recounted the entire matter to that employee. She asked the employee, directly and in terms, to carry it up the chain of command. She told the employee that she had already requested an escalation process and had received nothing. She asked that the employee's supervisor contact her.

155. Plaintiff further told that employee, during the call, that she believed the call was being recorded, that she hoped it was being recorded, and that she wanted the recording of that call forwarded to the employee's supervisor. That statement was a request that the recording be preserved and escalated, made to an employee of the agency's own body-worn camera records unit.

156. The employee undertook to consult her supervisor. The supervisor consulted is named in this action as Defendant Records Supervisor John or Jane Doe.

157. Plaintiff told that employee that deleted digital files are frequently recoverable, that she has a professional background in information technology and computer networking, and that recovery of files of this kind is work she could perform herself if given access. She asked that the request be routed to the personnel capable of attempting it.

158. The Hillsborough County Sheriff's Office was therefore told, by the requester, that the technical premise of its later position — that the recordings are not retrievable and that no system holds them — was doubtful, and it was told so before it ever took that position.

159. The employee told Plaintiff that she would send Plaintiff the form required to submit a request for retrieval of the deleted footage. No form was ever sent.

160. No supervisor ever contacted Plaintiff. She received no telephone call, no email, and no letter from that unit or from anyone above it. She was never given any process, form, or procedure by which the destroyed recordings could be sought or recovered, notwithstanding that she asked for one directly and notwithstanding that she had been advised such a process exists.

161. Plaintiff telephoned the Federal Bureau of Investigation immediately after that call, on the same day.

162. The answer that came back was that no video or camera footage existed. That answer was given before any Professional Standards complaint had been filed, and it cannot be reconciled with the agency's later written representation, on July 14, 2026, that a thorough review of body-worn camera footage across all four calls had been completed.

163. Plaintiff received no substantive response to the escalation request itself. No record has ever been produced showing that the request was logged, assigned, forwarded, investigated, or answered by anyone.

164. Plaintiff then filed a Professional Standards complaint, assigned Reference ID 01KX7R4DJ8-QZM5JWZP-TYAQWW9N and assigned to Defendant Corporal Hendricks.

165. On July 14, 2026, Corporal Hendricks wrote to Plaintiff: "This complaint was thoroughly reviewed to include all calls associated to the incident from August 2023. I reviewed the initial call you made about the ex-employee, the follow-up call, the call where you were transported to the hospital and any additional calls linked to this incident. A thorough review of BWC and photographs was completed. . . . I have documented each call and the findings accordingly. After this review, there were no policy violations identified and the complaint is unfounded." She directed Plaintiff to submit a public records request for the footage she said she had reviewed.

166. Plaintiff replied the same day, advising Corporal Hendricks that she had already submitted such a request and received nothing, and asking for the evidence numbers, call numbers, report numbers, and file references necessary for the Records Division to locate the exact footage the investigator said she had reviewed.

167. On July 15, 2026, Corporal Hendricks wrote: "To clarify my last email, the statute of limitations has expired on the charge of battery so there is no longer body worn camera videos associated to the calls."

168. On July 15, 2026, Plaintiff served on Corporal Hendricks a written preservation notice, a public records request, a request for clarification of the contradiction, a request for an independent point of contact, and a request for identification of the agency's ADA coordinator and reasonable accommodation process. The preservation notice covered original body-worn camera files from the responding calls, body-worn camera files created during the later investigation and interviews, archived and cloud-stored copies, backups and disaster-recovery copies, evidence-system audit trails and access histories, deletion and disposition logs, metadata and database records, photographs and extracted stills, and the Professional Standards working file.

169. The Hillsborough County Sheriff's Office did not respond to that notice.

170. On July 18, 2026, Plaintiff served a second written request, again seeking confirmation that the preservation notice had been forwarded to the agency's public records custodian, digital-evidence administrator, and information-technology personnel, and confirmation that no related record had been deleted, purged, overwritten, or altered since service.

171. The Hillsborough County Sheriff's Office did not respond to that request either.

172. The offense report the Sheriff's Office did produce independently states that body-worn camera footage from the prior calls was requested and reviewed during the battery investigation, and that the investigating deputy's body-worn camera was activated for the duration of the later investigation and interviews. The agency's own records therefore establish that at least two distinct categories of body-worn camera evidence existed.

173. At least seven body-worn camera video files were destroyed, purged, deleted, or permitted to be overwritten. The Sheriff's Office has never identified the date of deletion, the retention schedule or disposition authority relied upon, the person who authorized or executed the deletion, or whether any audit trail, access history, deletion log, metadata record, thumbnail, proxy file, archived copy, backup, or cloud-stored copy remains.

174. The sole justification the Hillsborough County Sheriff's Office has ever offered for the destruction of that evidence is the expiration of a two-year limitations period for simple battery.

175. That justification is false, and the agency knew it was false. Plaintiff sustained facial trauma, bilateral periorbital hematoma, and a traumatic brain injury, and two physicians told her she was fortunate to be alive. Injuries of that character are not simple battery. They describe

felony battery under Fla. Stat. § 784.041 and aggravated battery causing great bodily harm under Fla. Stat. § 784.045.

176. Prosecution for either offense is governed by the three-year limitations period of Fla. Stat. § 775.15(2)(b), which does not expire until August 4, 2026. The Sheriff's Office therefore destroyed the evidence of a felony while the felony remained fully prosecutable, and told Plaintiff that a misdemeanor clock she was never subject to had run.

177. The agency's own file establishes that it knew the severity of Plaintiff's injuries. Its personnel watched her removed from her business on a gurney. Its records reflect her transport to a hospital. Its stated basis for classifying the matter as a two-year misdemeanor was pretextual, and the pretext was constructed to justify destroying the only evidence that would have proven what its deputies did.

178. The expiration of a criminal prosecution period is not a records retention authority in any event. It does not authorize the destruction of evidence in an open administrative complaint, does not extinguish a public records obligation under Chapter 119, Florida Statutes, and does not permit the destruction of evidence after a preservation demand has been served.

179. Defendants destroyed or failed to preserve that evidence with knowledge that it was material to Plaintiff's claims and after actual notice that Plaintiff had demanded it. The destruction was in bad faith and was intended to deprive Plaintiff of the evidence.

**M. The July 20, 2026 Telephone Call**

180. On July 20, 2026, Corporal Hendricks telephoned Plaintiff. Plaintiff did not initiate the call. The call lasted twenty-two minutes.

181. Corporal Hendricks opened by stating that the call was her reply to Plaintiff's written correspondence and that she would not communicate by email. Plaintiff had already requested written responses more than once, in writing. Plaintiff asked again during the call, specifically so that she could read and understand the statute the investigator was citing. The request was refused.

182. Corporal Hendricks stated that the purpose of the call was to "clarify" what she had meant on July 14 by reviewing the videos. Her clarification was that when she said she reviewed the videos, she meant that there were none — that the footage is not retrievable, that there is no way to retrieve it, and that there is no system on which it is stored.

183. Corporal Hendricks further stated that some of the deputies involved are no longer employed by the Hillsborough County Sheriff's Office, and that she therefore could not question them. Plaintiff pleads that an agency may not treat the departure of its own personnel as a reason to forgo review of their conduct. A former employee may be interviewed, subpoenaed, and deposed. The records that person created, and the records created about that person, remain the property of the agency. The effect of the position taken is that an officer who leaves becomes unreviewable, and the agency's failure to complete its review before that departure becomes its own excuse.

184. Corporal Hendricks volunteered, without being asked and without any prompting from Plaintiff, that she was not going to arrest Jessica Torres Figueroa and was not going to arrest anybody. Plaintiff had not requested an arrest, had not raised the subject, and had not suggested it. The investigator assigned to review the conduct of deputies introduced the subject of declining to arrest the assailant on her own.

185. Corporal Hendricks stated that she is there to investigate the employees, not the person who attacked Plaintiff; that the deputies did nothing wrong; that she would pursue nothing as to any deputy; that she would not press charges against Plaintiff's attacker because the incident was more than two years old; that the case is closed; that "[t]here's no way I'm opening up this file"; and that she would not reopen it. When Plaintiff described what had happened, Corporal Hendricks responded that she could not say anything because she was not there.

186. Those positions, taken together, foreclose every avenue. The agency will not investigate the assailant because that is not its role. It has found no fault by its deputies. Its investigator cannot speak to what happened because she was not present. And the footage that would show what happened has been destroyed by the agency itself.

187. Plaintiff twice told Corporal Hendricks that she possessed audio recordings of the events, and that she also possessed a recording capturing the assailant's consent to being recorded. Corporal Hendricks expressed no interest in the recordings, did not request them, and did not ask to hear them. She reiterated that she would not reopen the file.

188. Plaintiff told Corporal Hendricks directly that the only report in existence was written by a third-party non-participating deputy containing errors of fact, and that the deputies who attended all four responses produced no reports at all. Plaintiff received no substantive answer to either point.

189. A finding that no deputy engaged in misconduct is said to rest on a review of records. If every deputy who attended all four responses generated no records, the sole existing record is a secondhand account containing errors, and the footage does not exist, then there was nothing to review and the review cannot have established what the agency says it established.

**N. The Denial of Disability Accommodation**

190. Plaintiff has a disability. The events of August 4, 2023 caused a traumatic brain injury and six months of memory loss, and aggravated symptoms that substantially limit her ability to organize, process, and communicate verbally about these events.

191. On July 15, 2026, Plaintiff requested in writing that the Hillsborough County Sheriff's Office identify its ADA coordinator and its reasonable accommodation process, and requested written rather than telephonic communication, a designated point of contact, written confirmation of receipt of her submissions, clear written explanations of decisions and conflicting information, and reasonable additional time to respond. That request was made a part of the Professional Standards complaint record. It received no response.

192. On July 20, 2026, Plaintiff told Corporal Hendricks directly that she was having difficulty communicating, that she has difficulty saying exactly what she means verbally, and that it would be easier for her if she could read it — which is why she had asked more than once for written communication.

193. Corporal Hendricks responded that Plaintiff was not having any communication problems at all, that Plaintiff had been communicating with her perfectly, that Plaintiff had shared all the information with her, and that Plaintiff did not have any problem at all.

194. The substance of Corporal Hendricks' response was that Plaintiff was not having trouble, that Plaintiff could communicate with her perfectly well, and that Plaintiff did not need an ADA accommodation. That determination was made by the investigator herself, on the telephone, in the middle of the call, without any interactive process, without reference to any policy, without consulting any coordinator, and without any written record.

195. The effect of that refusal was to compel a person who had told the agency she has difficulty communicating verbally to conduct the entire disposition of her complaint through a single unrecorded twenty-two-minute telephone call, in a format she had expressly identified as

the one she cannot use, while the agency simultaneously refused to reduce anything it said to writing.

196. Plaintiff asked Corporal Hendricks for an ADA representative. She asked for a reasonable accommodation. She asked that a third party of any kind be permitted to take part in the communications, having told the agency in writing that she was uncomfortable being the sole custodian of the record of this matter. She asked for written confirmation of receipt. She asked to escalate to someone else. She asked for written confirmation of the closure so that she would have it.

197. Every one of those requests was refused. Corporal Hendricks told Plaintiff there was no escalation procedure and that the case was closed.

198. The assigned investigator of a disability accommodation request thus decided, unilaterally and without any interactive process, that the requester did not need one — and refused to identify the coordinator whose function it is to make that determination.

199. The Hillsborough County Sheriff's Office has never identified an ADA coordinator, never identified a grievance procedure, never conducted any interactive process, never issued any written determination on the accommodation request, and never provided the requested modification.

**O. Facts Bearing on Animus That Remain Unknown Because Defendants Destroyed the Evidence**

200. During the events of August 4, 2023, Jessica Torres Figueroa referred to Plaintiff, in Spanish, by an epithet identifying Plaintiff by her race. Plaintiff is white. Torres Figueroa is not a state actor, and Plaintiff does not contend that Torres Figueroa's animus is itself actionable against these Defendants.

201. What Plaintiff cannot presently determine is whether the responding deputies shared, adopted, echoed, or acted upon animus of that kind. Deputy Jane Doe J-2 spent her entire presence at the scene coordinating with Torres Figueroa while refusing to interview, speak with, or take a statement from Plaintiff. Deputies ordered Plaintiff off her own property and left her assailant in possession of it. Deputies publicly berated Plaintiff in her assailant's presence. Whether those choices were driven in whole or in part by race is a question that the body-worn camera recordings would have answered.

202. Body-worn cameras capture what officers say to each other and to the people around them. They capture tone, epithets, asides, and the reasons officers give one another for the decisions they make. At least seven such recordings existed. Defendants destroyed them.

203. Plaintiff is therefore unable to plead the presence or absence of racial animus with the specificity she would otherwise possess, and she is unable to do so for one reason: Defendants destroyed the only contemporaneous record of what they said and why. Defendants are not entitled to the benefit of an evidentiary gap they created after being placed on notice to preserve the evidence that would have closed it.

204. Plaintiff further does not presently know whether any responding deputy had a personal, familial, social, or prior professional relationship with Torres Figueroa. The identities of the responding deputies have been withheld from her. The records that would disclose those identities and any such relationship are in Defendants' exclusive possession.

**P. Injury**

205. Plaintiff sustained lasting capillary damage in the soft tissue beneath her right eye. The damaged vessels remain visible today as persistent dark discoloration in the under-eye area. That damage has not resolved.

206. Plaintiff suffered a traumatic brain injury, facial trauma, bilateral periorbital hematoma, and six months of memory loss during which she could not drive, could not work, and could not manage her own affairs. Those injuries were inflicted on a body already weakened by recent hospitalization and recent medical procedures, and the harm to her was correspondingly greater than it would have been to a person in ordinary health.

207. Plaintiff lost her business and incurred the cost of rebuilding it from nothing.

208. Plaintiff held two remote positions at the time of the assault. She was terminated from both during the period of incapacity that followed. She was not able to obtain employment again until February 2024, six months after the assault.

209. Plaintiff never regained access to the contents of the premises. She never recovered a single item. Her salon equipment, her tattoo and permanent-makeup equipment, her inventory, her furnishings, and her business records were all lost. She was too injured to return to the premises, and the prospect of returning was itself intolerable to her. She was not capable of

recovering or selling what remained, and the entire contents were ultimately hauled to a dump and discarded by a person close to her, with assistance, because Plaintiff could not do it herself.

210. That loss followed directly from the surrender of the premises. Deputies who prevent a leaseholder from locking her own door, and who hand access to hostile parties, determine what happens to everything inside it.

211. Plaintiff was dispossessed of her leased commercial premises, her equipment, and her business records without any judicial process.

212. Plaintiff suffered the search of her locked vehicle and her purse, and the delay of emergency medical transport for a head injury, for the purpose of that search.

213. Plaintiff has been deprived of the evidence necessary to prove what was done to her, and of the ability to obtain a criminal referral, an accurate police record, or an honest administrative review.

214. Plaintiff has suffered severe emotional distress, humiliation, fear, loss of liberty, loss of property, loss of income and earning capacity, medical expense, and the aggravation of a pre-existing condition.

215. Plaintiff's injuries did not end when her bruises healed. She lost the capacity to work, to earn, and to provide, and she lost months in which she could not be present in her own household or for her own children. The consequences of August 4, 2023 remain present in her life and in the lives of the people who depend on her, nearly three years later. Plaintiff seeks these damages as her own and brings no claim on behalf of any other person.

## V. FEAR, INTIMIDATION, AND THE ABSENCE OF COUNSEL

216. Plaintiff states plainly that she is afraid of the Hillsborough County Sheriff's Office. She states it because it is true, and because it bears on matters this Court must decide: whether the conduct pleaded here would deter a person of ordinary firmness from petitioning for police assistance, whether Plaintiff faces a continuing condition warranting prospective relief, the measure of her damages, and the construction owed to a pleading prepared without a lawyer.

217. What the agency did, in sequence: four calls for service in a single day brought deputies to Plaintiff's business on each occasion, six in all. They did not remove the person who had no right to be there. They told Plaintiff to leave instead. They refused to let her lock her own door.

They berated her in front of the woman who then beat her. When she was strapped to a gurney with a head injury, one of them searched her locked vehicle and her purse and held her ambulance to finish. Her assailant stood over her and screamed at her while all of them watched.

218. Two more deputies came in the days that followed and told her nothing could be done. A supervising sergeant told her he had reviewed the matter. He produced no record that any review occurred, created no documentation of her concerns, and secured no evidence.

219. Nearly three years later the Professional Standards Bureau told her in writing that a thorough review of body-worn camera footage and photographs had been completed across all four calls and that findings had been documented for each, and that her complaint was unfounded. When she asked for the footage that had been reviewed, she was told to file a public records request. She had already filed one. When she said so, she was told the recordings no longer exist.

220. She then requested, verbally and on the record of that contact, that the agency apply a formal process to recover the recordings through its digital-evidence, forensic, or information-technology personnel. She disclosed in the same communication that she had gone to the Federal Bureau of Investigation for help and had been directed back to Internal Affairs. Nothing followed.

221. The investigator then declined to respond in writing at all. She telephoned instead, stated that she would not email, refused Plaintiff's written and verbal requests for written communication, refused to accept the audio recordings Plaintiff twice offered, refused to identify any appeal route, refused to escalate to any person outside her own bureau, refused to confirm the closure in writing, and stated that there was no way she would reopen the file.

222. An agency that will put nothing in writing has arranged matters so that there is nothing to review. Plaintiff understood that while it was happening. It is why she prepared a written record of the July 20, 2026 telephone call the same day it occurred.

223. The effect of that sequence on Plaintiff has been fear. She called for emergency assistance four times in one day and was scolded for calling. She has not called since. Conduct that would deter a person of ordinary firmness from petitioning the government for police assistance deterred her, and that is an element of the First Amendment claim pleaded below rather than a description of her feelings about it.

224. Plaintiff continues to live and to operate a business within the jurisdiction policed by the agency she is suing, and she will continue to depend on that agency for emergency response. That is a present and continuing condition, not a completed past injury, and it supports the prospective relief sought below.

225. Plaintiff does not allege that any Defendant has threatened her. She alleges the effect of the conduct pleaded in this Complaint, which is the effect conduct of that kind produces on the person it is directed at.

226. Plaintiff wishes to be clear about the limits of what she asks this Court to find. She does not ask the Court to condemn the Hillsborough County Sheriff's Office as an institution, and she makes no allegation about the many deputies who had nothing to do with these events and who do this work honorably. She alleges the conduct of identified individuals on identified dates, and the response of one bureau to a single complaint. That is the whole of her case and she asks for nothing beyond it.

227. Plaintiff wants the record to reflect one thing more. She values law enforcement and is glad her community has it. She telephoned the Hillsborough County Sheriff's Office four times on August 4, 2023 because she believed deputies would help her, and she would call again tomorrow if she needed help. Her complaint is not with the institution of policing, and it is not with the many deputies who do that work properly and at real cost to themselves. It is that a particular group of people, on particular dates, treated the rules that govern them as optional, and that the bureau charged with reviewing them agreed.

The Absence of Counsel

228. Plaintiff sought legal representation for these claims and was unable to obtain it. She contacted attorneys and was refused. In more than one instance the conversation ended once the identity of the prospective defendant was disclosed, before any evaluation of the facts occurred.

229. Plaintiff previously retained counsel to pursue the person who assaulted her. That representation proceeded until the involvement of the Hillsborough County Sheriff's Office became apparent. Counsel then withdrew without concluding the work he had begun, declined to represent her as to the Sheriff's Office, and instructed her not to contact his office again.

230. Plaintiff does not proceed without a lawyer by preference. She proceeds without one because she could not obtain one, and because the limitations periods governing these claims would not wait while she continued to look. Nothing in this section should be read as a concession that any attorney evaluated these claims on their merits and found them wanting; in the instances that matter, no evaluation was ever reached.

231. Plaintiff asks that this Complaint be construed liberally, as the law directs for pleadings prepared by a party proceeding without counsel, and she has moved separately for the appointment of counsel.

232. Plaintiff further states that she has a disability affecting her ability to organize, process, and communicate about these events; that she requested accommodation from the Defendant agency and was told she did not need one; and that she will request reasonable accommodation from this Court as this action proceeds.

## VI. TIMELINESS, ACCRUAL, AND TOLLING

233. Claims brought under 42 U.S.C. § 1983 in Florida are governed by Florida's residual four-year limitations period for personal injury actions. The events of August 4, 2023 are within that period.

234. Plaintiff's claims for denial of access to the courts, for civil rights conspiracy premised on concealment, for neglect to prevent under 42 U.S.C. § 1986, for spoliation, and for disability discrimination did not accrue until July 14 through July 20, 2026, when Plaintiff first learned that the body-worn camera evidence had been destroyed, that the agency's stated review of that evidence could not have occurred, and that her accommodation request would be refused. Those claims are independently timely.

### A. The Six Months Plaintiff Has No Memory Of

235. The blow that Plaintiff sustained on August 4, 2023 caused a traumatic brain injury that erased six months of her life. She has no memory of the period beginning August 4, 2023 and extending into February 2024. She does not remember it because it is not there to remember.

236. Two events from that period illustrate the condition better than a description of it can, and Plaintiff sets them out because the state of her cognition during those months is material to accrual and tolling.

237. Plaintiff lost her car. Something ordinary went wrong with it. She could not work out the sequence of steps required to have it repaired — a task she had performed without difficulty her entire adult life. She was unable to solve it, the car sat, and she eventually lost it altogether.

238. Plaintiff lost the telephone containing her video of the assault in the following way. She was walking home, not driving, because she could no longer drive. She dropped the telephone on the sidewalk. She looked down and saw it lying at her feet. She understood that she had dropped it. What she concluded, standing over it and looking directly at it, was that her telephone was lost, that it was gone, and that she would now have to obtain a new telephone and a new number. She did not pick it up. She walked away and left it on the sidewalk, and she was without a telephone for a long time afterward.

239. Plaintiff was not confused about where the telephone was. She could see it. The injury had taken something more basic than memory: the capacity to connect what she was looking at to what she should do about it.

240. On another occasion during that period Plaintiff attempted to read a children's book aloud. The text did not make sense to her. She concluded that the book itself was nonsense and that she could not believe she had purchased it. She photographed the page and sent the photograph to someone close to her. He telephoned her and read the same page aloud. Heard rather than read, it made sense to her immediately. She told him so, and he told her that was simply what the page said.

241. Plaintiff has almost no memory of that period at all. She does not remember her children during those months.

242. A person in that condition cannot investigate a police response, request records, identify witnesses, evaluate a legal claim, or preserve evidence. Plaintiff did none of those things during that period because she was not capable of doing them.

243. During that period Plaintiff could not drive. She could not work. She could not manage her own affairs, her own business, or her own legal matters. She was unable to investigate what had been done to her, unable to request records, unable to identify witnesses, unable to consult counsel, and unable to preserve evidence. A person who does not remember that a thing happened cannot take steps to vindicate it.

244. Accrual of a claim under 42 U.S.C. § 1983 is governed by federal law, and a claim does not accrue until the plaintiff knows or has reason to know of the injury and of the acts that caused it. Plaintiff had no such knowledge during the period she cannot recall. Accrual of her claims arising from the conduct of August 4, 2023 was therefore delayed by no less than six months, to no earlier than February 4, 2024.

245. Independently, the running of any applicable limitations period was equitably tolled for that same period. Plaintiff's inability to pursue her rights was the direct result of an injury inflicted in the very episode giving rise to these claims, and it was an extraordinary circumstance entirely beyond her control. Defendants may not measure a limitations period against a window of time they helped create and during which Plaintiff had no capacity to act.

246. Plaintiff asserts this six-month extension as to every claim pleaded in this Complaint, and asserts it cumulatively with, and in addition to, each of the further grounds set out below.

**B. Plaintiff Learned the Central Facts Within the Last Thirty Days and Acted Within Hours of Each**

247. Plaintiff did not know, and could not have known, that the deputies who attended the four calls for service on August 4, 2023 did not write reports. She learned it from the Hillsborough County Sheriff's Office itself, in writing, on July 14, 2026 — seventeen days before this Complaint was filed.

248. Plaintiff responded to that disclosure the same day. She wrote back on July 14, 2026 asking for the evidence numbers, call numbers, report numbers, and file references for the material the agency said it had reviewed.

249. Plaintiff did not know, and could not have known, that the body-worn camera recordings had been destroyed. She learned it in writing on July 15, 2026 — one day after being told those same recordings had been thoroughly reviewed.

250. Plaintiff acted on that disclosure within twenty-four hours. On July 15, 2026 she served a written preservation demand, a public records request, a written demand that the agency reconcile the contradiction between its two statements, a request for an independent point of contact, and a request for identification of the agency's ADA coordinator and accommodation process.

251. The agency did not respond. Plaintiff renewed the demand in writing on July 18, 2026, three days later. The agency did not respond to that either.

252. On July 20, 2026, when the agency finally responded by telephone and refused to reduce anything to writing, Plaintiff prepared a written record of the call the same day it occurred.

253. Plaintiff filed this action on August 3, 2026 — fourteen days after the telephone call in which the agency closed its file, and twenty days after she first learned that the reports did not exist.

254. Before filing any complaint with the Professional Standards Bureau, Plaintiff had already telephoned the agency's body-worn camera records unit, asked that the matter be carried up the chain of command, and stated that she had already requested an escalation process. She had also, in that same period, contacted the Federal Bureau of Investigation for assistance. She was advised that the matter was not qualified for federal involvement at that time and that the procedure was to bring it first to Internal Affairs and then to the Attorney General. She followed that instruction precisely. Plaintiff does not represent that any federal investigation is open, and none of the relief sought here depends on one.

255. Plaintiff anticipates the question of why she did not act sooner, and answers it directly. She did not act sooner because she did not know. She spent six months after the incident with no memory and no capacity. She then asked a supervisor to preserve the footage and told him she would return to the matter when she was well, which is what she did. When she returned to it, she was told the complaint was unfounded, that reports had not been required, and that the footage she had asked to be kept no longer exists. Each of those facts was new to her in July 2026, and each was disclosed to her by the agency rather than discovered in spite of it.

256. At no point after learning any material fact did Plaintiff wait. Every interval in the record above is measured in hours or days. The delay in this case belongs entirely to the agency that withheld the facts, and none of it belongs to Plaintiff.

### C. Concealment, Estoppel, and Continuing Violation

257. The running of any applicable limitations period was further tolled by Defendants' fraudulent concealment. Defendants generated a single false report, omitted the civilian eyewitness, produced no reports from the six deputies actually present, withheld the identities of every involved deputy, destroyed the body-worn camera evidence, and represented to Plaintiff

on July 14, 2026 that a thorough review of that evidence had been completed. Plaintiff could not have discovered the factual basis for these claims through the exercise of reasonable diligence while Defendants were actively concealing it.

258. Defendants' conduct constitutes a continuing violation. The concealment, the refusal to identify involved personnel, the refusal to preserve or recover evidence, and the refusal of disability accommodation are continuing and ongoing as of the date of this filing.

259. Plaintiff has separately served written notice of claim under Fla. Stat. § 768.28(6) upon the Hillsborough County Sheriff's Office and the Florida Department of Financial Services. Plaintiff's federal claims under 42 U.S.C. §§ 1983, 1985, and 1986, the Americans with Disabilities Act, and the Rehabilitation Act are not subject to that statute's pre-suit notice requirement or its 180-day waiting period. Plaintiff expressly reserves her Florida tort claims and will seek leave to amend to add them upon the earlier of a written denial or the expiration of the statutory 180-day period.

## VII. THE DUTIES DEFENDANTS OWED AND BREACHED

These are the obligations the law placed on Defendants before Plaintiff ever called them. Each was owed. Each was breached.

260. Fla. Stat. § 30.15 charges the Sheriff with keeping the peace, executing process, and performing the duties of the office throughout the county. That duty is owed to the lawful occupant of a business, not to the person unlawfully occupying it.

261. Fla. Stat. § 943.1718(2) requires an agency permitting body cameras to establish policies and procedures addressing their proper use, maintenance, and storage, including general guidelines for the storage, retention, and release of the recorded data.

262. Fla. Stat. § 943.1718(3)(c) requires that agency to retain body camera data in accordance with Fla. Stat. § 119.021. Fla. Stat. § 119.071(2)(l)5. requires that body camera recordings be retained for a minimum of ninety days, including recordings otherwise exempt from disclosure. Defendants did not retain the recordings and cannot say when they stopped.

263. Fla. Stat. § 119.071(2)(l)4.a. entitles a person who appears in a body camera recording to the portions of that recording relevant to her own presence, even where the recording is otherwise exempt from public disclosure. Plaintiff appears in every recording at issue. That

statutory entitlement was hers regardless of any exemption, and Defendants extinguished it by destroying the recordings.

264. Fla. Stat. § 943.1718(3)(d) requires the agency to perform periodic review of its actual body camera practices to ensure conformity with its own policies. Had that review occurred, the destruction of seven recordings in an open complaint would have been caught.

265. Chapter 119, Florida Statutes, obligates the agency to maintain public records, to respond to requests in good faith and within a reasonable time, and to dispose of records only in accordance with an applicable retention schedule. Plaintiff made requests. She received nothing.

266. Fla. Stat. § 257.36 and the records retention schedules promulgated under it govern the lawful disposition of agency records. The expiration of a criminal prosecution period is not among the authorities those schedules confer.

267. Fla. Stat. § 960.001 establishes guidelines for the fair treatment of victims by law enforcement agencies, including duties to inform victims of available services and of the status and disposition of the matter. Plaintiff was told nothing, given nothing, and offered nothing.

268. Article I, Section 16(b) of the Florida Constitution guarantees a crime victim the right to be treated with fairness and respect, to be free from intimidation, harassment, and abuse throughout the criminal justice process, to reasonable protection from the accused, to confer with the prosecuting authority, and to be informed of these rights. Plaintiff was scolded, mocked, left with her assailant, and never informed of any right she held.

269. 28 C.F.R. § 35.107 requires a public entity of this size to designate at least one employee responsible for ADA compliance and to adopt and publish grievance procedures. Defendants have never identified either, and the record of this matter suggests neither exists.

270. 28 C.F.R. § 35.130 and § 35.160 require reasonable modification of policies and practices and effective communication with individuals with disabilities. Plaintiff asked twice. She was told she did not need it.

271. Fla. Stat. § 112.532 governs the conduct of internal investigations of law enforcement officers and establishes that such investigations are formal proceedings subject to defined procedures. The Professional Standards Bureau conducted no interview of any responding

deputy, no interview of any dispatcher, no reconciliation of the records, and no examination of the evidence Plaintiff offered, and then certified the result as a completed thorough review.

272. Independent of any statute, once Defendants took control of the scene, ordered Plaintiff off her own property, refused to let her secure it, and directed the movements of the persons present, they assumed a duty of reasonable care toward Plaintiff that they did not owe before they intervened.

## VIII. THE PROTECTIONS DEFENDANTS WILL INVOKE AND WHY EACH FAILS

Plaintiff anticipates that Defendants will assert each of the following. Plaintiff pleads in advance the grounds that defeat each one.

273. Qualified immunity under 42 U.S.C. § 1983. It shields an officer only where no constitutional right was violated or the right was not clearly established. Every right asserted here was clearly established on August 4, 2023 and is enumerated in the paragraphs that follow.

274. Qualified immunity as to the agency. It does not exist. A municipality and a local government official sued in his official capacity have no qualified immunity and no good-faith defense to a claim under § 1983.

275. Eleventh Amendment immunity. It does not apply. A Florida sheriff performing local law enforcement functions acts as a county official rather than an arm of the State, and the Eleventh Amendment does not bar this action.

276. Sovereign immunity under Fla. Stat. § 768.28. It is waived to the extent provided by that statute. Plaintiff has served the statutory notice on the agency and on the Department of Financial Services and has pleaded her state claims in reserved form pending the statutory period.

277. Individual statutory immunity under Fla. Stat. § 768.28(9)(a). It is forfeited where an officer acts in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. Each individual Defendant did so, and each is therefore personally answerable, personally named, and personally exposed as to personal assets.

278. Discretionary function immunity under Florida law. It protects planning-level judgments about policy, not operational conduct in executing them. Searching a purse, holding an

ambulance, refusing to let an owner lock her door, writing a false report, and deleting a recording are operational acts.

279. The public duty doctrine. It does not apply where officers affirmatively create or increase the danger to a specific person, or where their conduct establishes a special relationship with her. Both occurred here.

280. Absolute immunity. It extends to judicial, quasi-judicial, and prosecutorial functions. The investigative and administrative acts of responding deputies and of an internal affairs investigator are not among them.

281. Immunity from punitive damages. Fla. Stat. § 768.28(5) bars punitive damages against the government entity. It does not bar punitive damages against an individual defendant sued in an individual capacity under § 1983, which remain available on a showing of evil motive or intent, or reckless or callous indifference to federally protected rights.

282. Sovereign immunity as to the Americans with Disabilities Act. It is unavailable. Defendant is a county agency, not the State, and Title II claims against a county are not barred.

283. Failure to exhaust administrative remedies. No exhaustion is required before bringing an action under 42 U.S.C. § 1983. In any event Plaintiff exhausted what was offered to her, and was told the file would not be reopened.

284. Preclusive effect of the Professional Standards finding. None attaches. The Bureau is not an adjudicative tribunal, its investigator took no testimony under oath, examined no witness, reconciled no record, and reviewed no evidence, and its finding was reached on a record the agency had already destroyed.

285. Reliance on lawful authority. No warrant, writ of possession, eviction order, court order, consent, or exigency authorized any act at issue. There was nothing to rely upon.

286. Records exemptions under Chapter 119. An exemption from disclosure is not an authorization to destroy, and it does not defeat Plaintiff's separate statutory entitlement under § 119.071(2)(l)4.a. to the portions of the recordings in which she appears.

287. The statute of limitations. Every limitations argument available to Defendants is answered in Section VI above, which pleads delayed accrual, the six months of Plaintiff's incapacity,

equitable tolling, fraudulent concealment, equitable estoppel, continuing violation, and a documented record of Plaintiff acting within hours of learning each material fact.

288. Comparative fault. Plaintiff did nothing to cause the assault. She said nothing to her assailant, did nothing to provoke her, and was struck inside her own place of business after calling for help and being told to leave it. Defendants have no basis to reduce their share of a harm they created by ordering her off her property, refusing to let her secure it, and berating her in front of the person who then attacked her.

289. Apportionment of fault to a nonparty. To the extent Defendants seek to apportion fault to Jessica Torres Figueroa, that apportionment does not diminish Defendants' liability for their own affirmative acts, for their deliberate indifference, or for the destruction of evidence. The federal claims in this action are not subject to comparative apportionment, and a defendant who creates the danger cannot allocate its consequences to the danger.

290. Election between the entity and the individual under Fla. Stat. § 768.28(9)(a). Plaintiff is aware that the statute makes liability for a state-law tort exclusive: where an officer acted in bad faith, with malicious purpose, or with wanton and willful disregard, the individual answers and the agency does not, and where the officer did not, the agency answers and the individual does not. Plaintiff pleads bad faith, malicious purpose, and wanton and willful disregard as to each individual Defendant, and pleads in the alternative, as Rule 8(d) permits, that if any Defendant is found not to have acted with that state of mind, the agency is liable for that Defendant's conduct. Defendants may not use the alternative structure of the statute to escape through both doors at once. Nothing in this paragraph limits Plaintiff's federal claims, which are governed by 42 U.S.C. § 1983 and permit recovery against the individual Defendants and against the agency alike.

291. Any defense at all, as to the destroyed evidence. Under Fed. R. Civ. P. 37(e)(2) and this Court's inherent authority, a party that destroys electronically stored information with intent to deprive another of its use may have its defenses stricken and judgment entered against it on liability. Plaintiff seeks that relief.

## IX. ALLEGATIONS DEFEATING QUALIFIED AND STATUTORY IMMUNITY

292. Every right asserted in this Complaint was clearly established on August 4, 2023 and remains clearly established today.

293. It was clearly established that a warrantless, non-consensual search of a locked private vehicle and a personal purse, without probable cause and without any recognized exception, violates the Fourth Amendment.

294. It was clearly established that officers who affirmatively create, increase, or aggravate the danger to a person from a private third party — and who then leave that person exposed to it — violate the Fourteenth Amendment under the state-created danger doctrine.

295. It was clearly established that deliberate indifference to, or affirmative delay of, treatment for a serious and obvious medical emergency violates the Fourteenth Amendment.

296. It was clearly established that government officials may not use state authority to dispossess a lawful leaseholder of commercial premises and transfer possession to an unauthorized third party without judicial process.

297. It was clearly established that retaliation against a citizen for calling for law enforcement assistance violates the First Amendment right to petition.

298. It was clearly established that officers who conceal, falsify, or destroy evidence in order to impair a victim's ability to obtain judicial redress violate the constitutional right of access to the courts.

299. It was clearly established that an officer who observes a fellow officer violating a citizen's constitutional rights, and who has a realistic opportunity to intervene, is personally liable for failing to do so.

300. Each individual Defendant acted in bad faith, with malicious purpose, and in a manner exhibiting wanton and willful disregard of Plaintiff's human rights, safety, and property. Under Fla. Stat. § 768.28(9)(a), that conduct removes the statutory shield from personal liability and exposes each individual Defendant personally, and personally as to assets, to any judgment entered.

301. The conduct alleged here is not the product of negligence, inadvertence, mistake, or reasonable error of judgment. Deputies do not accidentally search a locked vehicle over an express refusal. An agency does not accidentally write that it thoroughly reviewed footage that it says one day later does not exist. An investigator does not accidentally tell a person who has requested a disability accommodation that she does not have a disability.

## X. CAUSES OF ACTION

Each Count below incorporates only the common factual allegations of this Complaint and no other Count. No Count adopts, realleges, or incorporates the allegations of any preceding Count. Each Count identifies the specific Defendants against whom it is asserted and the specific conduct on which it rests. Sections VII and VIII above are pleaded to identify the legal duties Defendants owed and to answer in advance the affirmative defenses Defendants are expected to raise; they are not asserted as independent causes of action.

### STATEMENT OF CANDOR REGARDING DISFAVORED CLAIMS

Plaintiff is not a lawyer. She states the following plainly rather than leaving this Court to infer it, and rather than allowing any party to suggest later that she did not know.

302. Plaintiff understands that the general rule of DeShaney v. Winnebago County Department of Social Services is that the Constitution imposes no affirmative duty on the State to protect a person from violence at the hands of a private actor, and that the exception for danger created or increased by the State's own affirmative conduct has been applied narrowly in this Circuit. Plaintiff understands that Count IV is asserted against that background and that Defendants are likely to move to dismiss it on that ground. She asserts it anyway, for three reasons.

303. First, because she believes these facts fall within the exception rather than the rule. The deputies here did not merely decline to protect Plaintiff from a stranger. They removed her from her own premises, forbade her to lock her own door, mocked her in front of the woman who then beat her, and left that woman in possession of the building. The danger did not exist in that form before they arrived. It existed in that form when they left.

304. Second, because a claim not raised is a claim waived. Plaintiff asserts Count IV expressly to preserve the issue, and states that purpose on the record now so that no party may later characterize it as an afterthought or as inadvertence.

305. Third, because if the doctrine's boundary is narrow, the boundary should be located against facts rather than assumed. Two physicians told Plaintiff she was fortunate to be alive. She asks this Court to reach the question rather than treat it as foreclosed.

306. Plaintiff makes the same acknowledgment as to Count XI. She understands that a claim under 42 U.S.C. § 1985(3) requires class-based invidiously discriminatory animus, and that

whether disability constitutes such a class is unsettled. She pleads it in good faith on that understanding, and preserves it.

307. Plaintiff does not ask this Court to disregard governing law, and she asks for no exception on account of proceeding without counsel. She asks only that these two Counts be understood as deliberately and knowingly asserted. Should the Court dismiss either, Plaintiff respectfully requests that it do so without prejudice to the remaining Counts, none of which depends on either one.

## COUNT I

### 42 U.S.C. § 1983 — FOURTH AMENDMENT

(Against Deputy Jane Doe J-2 and Deputies John and Jane Does 1 through 6)

Unreasonable Search of Vehicle and Purse

308. Plaintiff realleges and incorporates paragraphs 1 through 301 as though fully set forth herein.

309. On August 4, 2023, Defendant Deputy Jane Doe J-2, acting under color of state law, entered and searched Plaintiff's locked private vehicle and searched Plaintiff's purse.

310. The search was conducted without a warrant, without probable cause, without consent, over Plaintiff's express verbal refusal, without an arrest, without exigent circumstances, and without any other recognized exception to the warrant requirement.

311. Plaintiff had a reasonable and legitimate expectation of privacy in her locked vehicle and in her purse.

312. Defendants Does 1 through 6 were present, observed the search, had a realistic opportunity to intervene, and did not.

313. The search was objectively unreasonable and violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

314. As a direct and proximate result, Plaintiff suffered the injuries described above.

## COUNT II

**42 U.S.C. § 1983 — FOURTH AMENDMENT**

(Against Deputy Jane Doe J-2 and Deputies John and Jane Does 1 through 6)

Unreasonable Seizure and Unlawful Detention of an Injured Person

315. Plaintiff realleges and incorporates paragraphs 1 through 301 as though fully set forth herein.

316. On August 4, 2023, Plaintiff was strapped to an emergency medical services gurney, physically restrained, suffering acute head trauma, and awaiting emergency transport.

317. Defendants intercepted, held, and delayed that transport. Plaintiff was not free to leave and was not permitted to leave.

318. The detention served no legitimate law enforcement purpose. Its purpose was to permit the completion of an unlawful search.

319. No reasonable officer could have believed that detaining a head-injured person on a gurney, and delaying her emergency transport, in order to search her purse and vehicle without a warrant, was lawful.

320. That seizure was unreasonable and violated the Fourth and Fourteenth Amendments.

321. As a direct and proximate result, Plaintiff suffered the injuries described above.

**COUNT III**

**42 U.S.C. § 1983 — FOURTEENTH AMENDMENT**

(Against Deputy Jane Doe J-2 and Deputies John and Jane Does 1 through 6)

Deliberate Indifference to Serious Medical Needs

322. Plaintiff realleges and incorporates paragraphs 1 through 301 as though fully set forth herein.

323. Plaintiff's medical need was objectively serious and obvious. She had been beaten, had visible facial trauma and bilateral periorbital hematoma, had sustained a traumatic brain injury, and had been placed on a gurney by emergency medical personnel for transport to a hospital.

324. Defendants had actual subjective knowledge of that serious medical need. That knowledge did not begin with the assault. Plaintiff had told the responding deputies earlier that same day that she was ill, that she had recently spent close to a week hospitalized for a condition that nearly killed her, that she had undergone two procedures, and that she had just donated blood. Defendants knew before the assault that they were dealing with a physically compromised person, and they knew after it that she had sustained a head injury on top of that condition.

325. Defendants nonetheless delayed Plaintiff's emergency medical transport, and did so not for any medical or safety reason but to conduct a search they had no lawful authority to conduct.

326. Delaying emergency transport for a head injury in order to execute an unlawful search constitutes deliberate indifference and conduct that shocks the conscience.

327. As a direct and proximate result, Plaintiff suffered aggravation of her injuries, delayed treatment, and the injuries described above.

## COUNT IV

## 42 U.S.C. § 1983 — FOURTEENTH AMENDMENT

(Against Deputy LaSalle and Deputies John and Jane Does 1 through 6)

Substantive Due Process — State-Created Danger

328. Plaintiff realleges and incorporates paragraphs 1 through 301 as though fully set forth herein.

329. Defendants did not merely fail to protect Plaintiff. They took affirmative acts that created, increased, and aggravated the danger she faced from Torres Figueroa.

330. Those affirmative acts included: ordering Plaintiff to leave her own place of business; refusing to permit Plaintiff to lock and secure her own premises; publicly scolding, mocking, and humiliating Plaintiff in the presence of her assailant, including by telling her to "grow up" and that "if you're afraid of sharks, don't go into the water"; leaving the assailant inside and around the premises; surrendering control of the premises to the assailant; and permitting the assailant to stand over, follow, and scream at Plaintiff while Plaintiff was physically restrained on a gurney with a head injury in front of six deputies.

331. Those acts also included a deputy's parting remarks to Torres Figueroa immediately before he left the premises, telling her in substance to stop talking and remarking on her age, after which he departed and the assault followed.

332. What was required of Defendants was minimal. A single deputy remaining in a marked patrol vehicle outside the premises, for the period it took Torres Figueroa to remove her property, would have supplied the deterrence Plaintiff had called for and would in all likelihood have prevented the assault entirely. Plaintiff asked for presence, not intervention. Defendants supplied neither, and instead took the affirmative steps described above.

333. Defendants took those acts with knowledge of Plaintiff's physical condition, which she had told them about directly: recent hospitalization for a life-threatening condition, two recent procedures, a recent blood donation, and her plainly stated report that she was sick and did not feel well. Officers who know a person is physically compromised and who then strip her of the ability to secure her premises, direct her movements, and leave a hostile party in possession of her building have created a danger calibrated to that person's known vulnerability.

334. Those acts were directed at Plaintiff specifically, placed her at substantial risk of serious, immediate, and proximate harm, and made her more vulnerable to that harm than she would have been had Defendants never arrived.

335. Defendants acted with deliberate indifference to a known and obvious risk, and their conduct was arbitrary and conscience-shocking.

336. As a direct and proximate result, Plaintiff was assaulted and suffered the injuries described above.

## COUNT V

### 42 U.S.C. § 1983 — FIFTH AND FOURTEENTH AMENDMENTS

(Against Deputies John and Jane Does 1 through 6 and Deputy Jane Doe J-2)

Procedural Due Process — Deprivation of Property Without Process

337. Plaintiff realleges and incorporates paragraphs 1 through 301 as though fully set forth herein.

338. Plaintiff held a constitutionally protected property interest in her leasehold at 8428 West Waters Avenue, in her possession of that premises, and in the business equipment, inventory, and records inside it.

339. Defendants, acting under color of state law, deprived Plaintiff of that property interest: they ordered her off the premises, refused to allow her to secure it, and transferred physical possession and control of the building and its contents to a person with no legal right to it.

340. No court had issued a writ of possession. No eviction action had been filed. No pre-deprivation hearing occurred. No post-deprivation remedy was made available.

341. Deputies have no lawful authority to determine commercial possession at the scene and to enforce that determination by force of office. That determination belongs to a court.

342. As a direct and proximate result, Plaintiff lost possession of her premises, lost her business, and suffered the injuries described above.

## COUNT VI

## 42 U.S.C. § 1983 — FOURTEENTH AMENDMENT

(Against Deputy Jane Doe J-2 and Deputies John and Jane Does 1 through 6)

Equal Protection — Class of One

343. Plaintiff realleges and incorporates paragraphs 1 through 301 as though fully set forth herein.

344. Plaintiff was intentionally treated differently from Torres Figueroa, who was similarly situated in that both were present at the same scene, on the same calls, before the same deputies.

345. Torres Figueroa — the aggressor and the unauthorized occupant — was accommodated, interviewed, credited, left in possession of the premises, and never arrested. Plaintiff — the lawful leaseholder and the injured party — was ordered off her own property, refused permission to secure it, publicly mocked, never interviewed, never given the opportunity to provide a statement, searched, and detained.

346. The differential treatment culminated in the arrest decision. A deputy who examined the video evidence concluded that Torres Figueroa should be arrested and said so. A supervisor who had not examined that evidence forbade it. No comparable protection was extended to Plaintiff at any point.

347. There was no rational basis for that differential treatment. It was the product of intentional animosity toward Plaintiff and favoritism toward her assailant.

348. As a direct and proximate result, Plaintiff suffered the injuries described above.

## COUNT VII

### 42 U.S.C. § 1983 — FIRST AMENDMENT

(Against Deputies John and Jane Does 1 through 6 and Deputy LaSalle)

Retaliation for Petitioning the Government

349. Plaintiff realleges and incorporates paragraphs 1 through 301 as though fully set forth herein.

350. Plaintiff engaged in protected First Amendment activity when she called 911 four times on August 4, 2023 to request law enforcement assistance and to report a crime against her.

351. Defendants retaliated against that protected activity by scolding, mocking, berating, and humiliating Plaintiff for having made those calls, by ordering her off her own property, and by abandoning her to her assailant.

352. That retaliation would deter a person of ordinary firmness from continuing to call for emergency assistance, and it did deter Plaintiff.

353. There was a causal connection between Plaintiff's calls and Defendants' retaliatory conduct.

354. As a direct and proximate result, Plaintiff suffered the injuries described above.

## COUNT VIII

### 42 U.S.C. § 1983 — FIRST AND FOURTEENTH AMENDMENTS

(Against All Individual Defendants, including Deputy Deena Biland, Corporal Kristin Hendricks, Deputy Jane Doe 7 and Deputies John and Jane Does 8 and 9, Professional Standards Supervisor John or Jane Doe, Records Custodian Jane Doe, and Records Supervisor John or Jane Doe; and Defendant Chronister in his official capacity)

Denial of the Right of Access to the Courts

355. Plaintiff realleges and incorporates paragraphs 1 through 301 as though fully set forth herein.

356. Plaintiff had a non-frivolous underlying claim arising from the assault of August 4, 2023 and from the conduct of the responding deputies.

357. Defendants engaged in a course of official conduct that concealed the facts of that claim and rendered it impossible for Plaintiff to prove: they produced no reports from the six deputies actually present; they generated a single false report, authored by a deputy who was not there, inverting the narrative and attributing the assailant's conduct to Plaintiff; they omitted the civilian eyewitness from that report; they withheld the identities of every involved deputy despite repeated written demand; they destroyed at least seven body-worn camera recordings after Plaintiff had requested them; they refused to attempt recovery; and they represented that a thorough review of that destroyed evidence had been completed.

358. Defendant Hendricks independently and personally impaired Plaintiff's access to the courts by refusing to accept Plaintiff's offered audio recordings of the incident, refusing to issue any written final disposition, refusing to identify any appeal or review mechanism, refusing to escalate the matter to any reviewer outside her own chain of command, refusing to communicate in writing at all, and unilaterally closing the file with the statement that there was no way she would reopen it.

359. A complainant who is given no written disposition, no appeal route, no identified reviewer, and no record of what was decided has been deprived of the documentary predicate necessary to seek review anywhere else. That was the purpose and the effect.

360. Defendant Deputy Deena Biland authored the only account of these events that exists in the agency's file. She was not present, witnessed nothing, and recorded the statements of others, including the person who committed the assault. Her report inverts the incident and

attributes the assailant's conduct to Plaintiff. A false report authored by a non-witness is not a defective record; it is the manufacture of the only record.

361. Defendants Deputies John and Jane Does 8 and 9 were dispatched, assigned, or represented to be en route to interview Plaintiff at the hospital on August 4, 2023 and never appeared. Defendant Deputy Jane Doe 7 came to see Plaintiff days later and produced no report. In consequence, no statement was ever taken from the injured party, and the agency's file contains the account of every person present except the one who was harmed.

362. Defendants Records Custodian Jane Doe and Records Supervisor John or Jane Doe received Plaintiff's request that the missing footage be recovered and escalated up the chain of command, at a time before any Professional Standards complaint had been filed. They returned the answer that no footage existed. No record of that request being logged, assigned, forwarded, or answered has ever been produced, and the answer they gave cannot be reconciled with the agency's later written representation that the same footage had been thoroughly reviewed.

363. That conduct was not negligent recordkeeping. It was designed to, and did, foreclose Plaintiff's ability to obtain criminal referral, administrative review, and civil redress.

364. The arrest that Deputy Biland intended to make, and that a supervisor forbade, would have generated the arrest record, charging documents, and evidentiary chain that Plaintiff would have used to pursue both criminal and civil remedies. Its prevention at the supervisory level, followed by the destruction of the recordings, removed the foundation of Plaintiff's case at both ends.

365. The remedies Plaintiff has lost are specific and identifiable. She has lost the ability to obtain a criminal prosecution of her assailant on an accurate record, because the agency declined to pursue one and destroyed the evidence that would have supported it. She has lost the ability to correct the false report that stands as the only official account of what was done to her. She has lost the evidence that would have identified the deputies who were present, without which she cannot name them in this action and must proceed against them as fictitious parties. And she has lost the recordings themselves, which were the only contemporaneous and unimpeachable proof of what the responding deputies did and said.

366. The filing of this action restores none of those things. A plaintiff who must litigate against unnamed defendants, without the recordings that would have proven her case, has suffered

precisely the injury the constitutional right of access to the courts exists to prevent. The right is to a meaningful opportunity to be heard, not to the bare ability to file a piece of paper.

367. As a direct and proximate result, Plaintiff has been deprived of her constitutional right of meaningful access to the courts and has suffered the injuries described above.

## COUNT IX

### 42 U.S.C. § 1983 — FAILURE TO INTERVENE

(Against Deputy LaSalle, Deputy Jane Doe J-2, and Deputies John and Jane Does 1 through 6)

368. Plaintiff realleges and incorporates paragraphs 1 through 301 as though fully set forth herein.

369. Each Defendant named in this Count was physically present at Plaintiff's business on August 4, 2023.

370. Each observed one or more of the following constitutional violations in progress: the warrantless search of Plaintiff's locked vehicle and purse; the delay of Plaintiff's emergency medical transport; the refusal to allow Plaintiff to secure her own premises and the transfer of possession to her assailant; the public berating and humiliation of Plaintiff; and the assailant standing over, following, and screaming at Plaintiff while she was restrained on a gurney.

371. Each had a realistic and reasonable opportunity to intervene to prevent or stop those violations.

372. Each failed to intervene.

373. As a direct and proximate result, Plaintiff suffered the injuries described above.

## COUNT X

### 42 U.S.C. § 1983 — CONSPIRACY TO VIOLATE CIVIL RIGHTS

(Against All Individual Defendants)

374. Plaintiff realleges and incorporates paragraphs 1 through 301 as though fully set forth herein.

375. Two or more of the Defendants reached an understanding, whether express or tacit, to deprive Plaintiff of her rights under the First, Fourth, and Fourteenth Amendments.

376. The object of that agreement was to protect the responding deputies and the agency from liability by suppressing the factual record of what occurred on August 4, 2023.

377. Overt acts in furtherance of the agreement include: the collective failure of every deputy who attended any of the four responses to generate any report; the production of a single false report by a non-participating deputy inverting the narrative to attribute the assailant's conduct to Plaintiff; the omission of the civilian eyewitness; the failure of Defendant Sergeant John Doe to document Plaintiff's complaint or secure the evidence after being placed on notice on August 5, 2023; the destruction of at least seven body-worn camera recordings after a preservation demand; the refusal to attempt recovery; the withholding of every involved deputy's identity; the July 14, 2026 written representation that a thorough review of that evidence had been completed; and the closing of the Professional Standards file on that basis.

378. As a direct and proximate result, Plaintiff suffered actual injury and the deprivation of her constitutional rights.

## COUNT XI

### 42 U.S.C. § 1985(3) — CONSPIRACY TO DEPRIVE EQUAL PROTECTION

(Against All Individual Defendants)

379. Plaintiff realleges and incorporates paragraphs 1 through 301 as though fully set forth herein.

380. Two or more of the Defendants conspired for the purpose of depriving Plaintiff of the equal protection of the laws and of equal privileges and immunities under the laws.

381. The conspiracy was motivated by invidiously discriminatory animus against Plaintiff on the basis of her disability, including her traumatic brain injury and the cognitive and communicative impairments arising from it, and by animus toward her as a person asserting a disability accommodation and asserting rights as a crime victim.

382. Defendants acted in furtherance of the conspiracy by the overt acts alleged above, including the destruction of evidence, the falsification and inversion of the official record, the

concealment of involved personnel, and the refusal to conduct any interactive process on Plaintiff's accommodation request.

383. Plaintiff was injured in her person and property and deprived of rights and privileges of a citizen of the United States.

## COUNT XII

## 42 U.S.C. § 1986 — NEGLECT TO PREVENT A CIVIL RIGHTS CONSPIRACY

(Against Sergeant John Doe, Patrol Supervisor John or Jane Doe, Corporal Kristin Hendricks, Professional Standards Supervisor John or Jane Doe, Records Supervisor John or Jane Doe, and Defendant Chronister in his official capacity)

384. Plaintiff realleges and incorporates paragraphs 1 through 301 as though fully set forth herein.

385. Each Defendant named in this Count had knowledge that wrongs conspired to be done and about to be done, as described in Count XI, were being committed.

386. Defendant Sergeant John Doe was told by Plaintiff on or about August 5, 2023, in specific terms, that deputies had searched her vehicle without her consent after she was injured, and that deputies had watched while her assailant screamed over her as she was carried out by emergency medical personnel. He was told by the injured party that her rights had been violated, and he was told which rights and how.

387. He responded that he had reviewed everything and would take no further action, and he directed Plaintiff to sue her assailant. He had the power to order reports written, to secure the body-worn camera evidence, to refer the matter for investigation, and to correct the record. He did none of it, and he created no record of the call. Whatever review he described has never been produced and may never have occurred.

388. Defendant Corporal Hendricks learned no later than July 2026 of the preservation demands, the report discrepancies, the absence of reports from the responding deputies, and the destruction of the body-worn camera evidence. She had the power to reopen the file, to escalate the matter, to order a forensic recovery attempt, and to correct the record. She refused each, and stated affirmatively that she would not reopen the file.

389. Defendant Patrol Supervisor John or Jane Doe was told by the assigned deputy that an arrest was warranted on the evidence she had reviewed. That Defendant had the power to authorize the arrest, to review the video himself or herself, to order that reports be written, and to secure the body-worn camera recordings. That Defendant instead forbade the arrest and left the record as it was.

390. Defendant Professional Standards Supervisor John or Jane Doe reviewed, approved, ratified, or authorized the disposition of Plaintiff's complaint. That review put this Defendant in possession of the same contradiction, the same missing reports, the same destroyed recordings, and the same refused accommodation. This Defendant had the power to reject the disposition, to order the file reopened, to direct a recovery attempt, and to assign a different reviewer. This Defendant did none of it and approved the closure instead.

391. Defendant Records Supervisor John or Jane Doe was the supervisor to whom Plaintiff's recovery and escalation request was carried, before any Professional Standards complaint existed. This Defendant had the power to initiate a forensic recovery, to place a hold on the recordings, to log and route the escalation request, and to inform Plaintiff of the actual status of the files. This Defendant instead returned the answer that no footage existed and did nothing further.

392. Defendant Chronister is named in this Count in his official capacity only. Plaintiff alleges no personal participation by the Sheriff in the events of August 4, 2023. Plaintiff alleges that the Office, through the supervisory personnel identified above and through the Professional Standards Bureau, acquired knowledge of these wrongs and possessed the authority to prevent or correct them, and that the Office did neither.

393. Each Defendant named in this Count neglected or refused to prevent or aid in preventing those wrongs when each had the power to do so and when such wrongs could have been prevented by reasonable diligence.

394. As a direct and proximate result, Plaintiff suffered the injuries described above.

## **COUNT XIII**

### 42 U.S.C. § 1983 — MUNICIPAL LIABILITY UNDER MONELL

(Against Defendant Chad Chronister, in his official capacity as Sheriff of Hillsborough County)

395. Plaintiff realleges and incorporates paragraphs 1 through 301 as though fully set forth herein.

396. Defendant Chronister is the final policymaking authority for the Hillsborough County Sheriff's Office.

397. The constitutional violations alleged in this Complaint were caused by the following customs, policies, and practices of the Hillsborough County Sheriff's Office:

398. (a) A widespread custom and practice of declining to document calls for service involving victims the agency has decided not to credit, evidenced here by every deputy who attended any of the four responses generating no report and by the agency's position that three of the four calls "did not require a report written."

399. (b) A widespread custom and practice of generating incident reports through non-participating deputies who record secondhand accounts, permitting the official record to be constructed without any officer who was present taking responsibility for its accuracy.

400. (c) A policy, custom, and practice of treating the expiration of a criminal prosecution period as authority to destroy body-worn camera evidence, including evidence subject to a pending public records request, a pending administrative complaint, and an express preservation demand.

401. (d) A failure to establish or enforce any supervisory control over body-worn camera retention, report integrity, or the identification of involved personnel.

402. (e) A failure to train deputies on the constitutional limits of warrantless searches, on the handling of vulnerable and injured victims, on the prohibition against adjudicating commercial property possession without judicial process, and on the duty to intervene.

403. (f) A failure to establish, publish, or staff any ADA coordinator function, any grievance procedure, or any interactive process, as required by 28 C.F.R. §§ 35.107 and 35.130.

404. (g) A distinct set of failures at the Professional Standards Bureau, which is the sole internal mechanism by which the agency reviews its own deputies: closing a complaint as unfounded on a record the agency had itself destroyed; treating the review of nothing as the review of everything; declining to interview a single responding deputy, supervisor, dispatcher, or civilian witness; declining to reconcile the agency's own narrative against its own contemporaneous

dispatch records; declining to examine evidence a complainant offered; declining to inquire whether any deputy had a relationship with the person who committed the underlying offense; refusing written communication to a complainant who requested it as a disability accommodation; issuing no written disposition; identifying no appeal route; and refusing escalation to any reviewer outside the Bureau. A complaint process operated in that manner cannot function as a safeguard against misconduct, because it is capable of producing only one result.

405. (h) A practice of supervisory override of arrest decisions made by the deputies who examined the evidence. The assigned deputy here reviewed video of the assault, determined an arrest was warranted, and communicated that to the victim. A supervisor who had not reviewed that evidence forbade it. That was a final decision by a person with supervisory authority, and it determined the entire subsequent course of this matter: no arrest, no charge, no accurate record, and ultimately no evidence.

406. (i) Ratification: the Professional Standards Bureau, with knowledge of the underlying conduct, the missing reports, the false report, the destroyed evidence, and the refused accommodation, approved that conduct, classified the complaint as unfounded, and closed the file with a stated refusal ever to reopen it. That is the agency's final decision, and it adopts the underlying conduct as agency practice.

407. (j) A pattern of separations among the personnel involved in these events. Defendant Deputy Deena Biland, the author of the only report, is no longer employed by the agency. The Professional Standards Bureau told Plaintiff that other involved deputies are no longer employed there and that it therefore could not question them. Plaintiff does not presently know how many of the personnel involved in these events have separated from the agency, when each separated, whether any separation occurred while that person was under investigation or with discipline pending, or whether any separation was in lieu of discipline. Those facts are recorded in the agency's personnel and disciplinary files and are known to Defendants alone. Plaintiff pleads the pattern and will seek those records in discovery.

408. (k) A practice of announcing that a complete review has been performed while producing no record of any review having occurred. Defendant Sergeant John Doe told Plaintiff in August 2023 that he had reviewed everything and that nothing further would be done. The Professional Standards Bureau told her in July 2026 that a thorough review had been completed and that her complaint was unfounded. Neither review has ever been documented to Plaintiff, and the

evidence that either would have required no longer exists. An agency in which two separate levels of authority, three years apart, announce complete reviews that leave no trace has a practice, not an aberration.

409. (l) A practice under which the separation of an employee terminates the agency's review of that employee's conduct. The Professional Standards Bureau stated to Plaintiff that certain involved deputies could not be questioned because they no longer work for the agency, and it closed her complaint without questioning them. An agency that permits departure to conclude review creates a standing route by which conduct escapes examination, and permits its own delay to produce that result.

410. (m) Negligent retention: the Sheriff's Office retained deputies with known misconduct patterns, including Defendant Deputy Deena Biland, who was subsequently separated from the agency, without corrective supervision over her reporting.

411. Plaintiff does not rest this claim on a single incident of inadequate training. She rests it principally on ratification. The Professional Standards Bureau is the agency's own designated mechanism for reviewing the conduct of its deputies. It examined this matter with knowledge of the missing reports, the report authored by a deputy who was not present, the destroyed recordings, the unreconciled dispatch records, and the refused accommodation, and it approved all of it. That approval was rendered by the Bureau and by its supervising authority, and it was final: the investigator stated that there was no way she would reopen the file, and identified no route by which anyone else could.

412. When the final reviewing authority of a law enforcement agency examines conduct of this kind and pronounces it compliant, the agency has adopted that conduct as its own. The controlling question is not what a written policy provides but what the agency approves in practice, and the Hillsborough County Sheriff's Office approved every part of this.

413. Each of these customs, policies, and practices reflects deliberate indifference to the constitutional rights of persons who come into contact with the Hillsborough County Sheriff's Office, and each was the moving force behind the violations of Plaintiff's rights.

414. As a direct and proximate result, Plaintiff suffered the injuries described above.

**COUNT XIV**

## TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §§ 12131–12134

(Against Defendant Chad Chronister, in his official capacity as Sheriff of Hillsborough County)

415. Plaintiff realleges and incorporates paragraphs 1 through 301 as though fully set forth herein.

416. The Hillsborough County Sheriff's Office is a public entity within the meaning of 42 U.S.C. § 12131(1).

417. Plaintiff is a qualified individual with a disability within the meaning of 42 U.S.C. § 12131(2). She has a physical and mental impairment that substantially limits one or more major life activities, including concentrating, thinking, communicating, and the operation of neurological and brain function, and she has a record of such impairment.

418. The Professional Standards complaint process, the public records process, and the agency's communications with complainants are services, programs, and activities of a public entity.

419. Plaintiff requested a reasonable modification: that the agency communicate with her in writing, provide a designated point of contact, confirm receipt of her submissions, explain conflicting information in writing, and allow reasonable additional time. She made that request in writing on July 15, 2026 and verbally on July 20, 2026.

420. The requested modification was reasonable, would not have fundamentally altered the nature of the program, and would have imposed no undue burden. The agency was already communicating with Plaintiff in writing before it chose to stop.

421. Defendant denied the modification. The assigned investigator told Plaintiff that she did not have a communication problem, refused to identify an ADA coordinator, refused to identify any accommodation process, refused to escalate the request, refused to confirm the file's closure in writing, and refused to communicate in writing in any way.

422. Defendant failed to designate a responsible employee and failed to adopt and publish grievance procedures as required by 28 C.F.R. § 35.107, and failed to engage in any interactive process.

423. Defendant failed to ensure effective communication as required by 28 C.F.R. § 35.160.

424. Defendant further violated 28 C.F.R. § 35.130 by failing to make reasonable modifications in policies, practices, and procedures necessary to avoid discrimination on the basis of disability, as required by § 35.130(b)(7)(i); by affording Plaintiff an opportunity to participate in and benefit from the agency's complaint process that was not equal to that afforded others, in violation of § 35.130(b)(1)(ii); by utilizing a communication method that had the effect of subjecting Plaintiff to discrimination on the basis of disability, in violation of § 35.130(b)(3); and by imposing an eligibility criterion — the ability to conduct the disposition of a complaint through a single unrecorded telephone call — that screened Plaintiff out from full and equal enjoyment of the agency's services, in violation of § 35.130(b)(8).

425. Defendant's denial was intentional and constituted deliberate indifference: Plaintiff informed the agency directly of her need, in writing and again by telephone, and the agency's response was to deny that the need existed.

426. The form that denial took carries its own weight. A sworn law enforcement investigator, holding the file, told the person who had just described her own impairment that the impairment was not there — that she was communicating perfectly and did not need what she had asked for twice. That is not a determination the investigator was authorized to make, and it did more than refuse a modification. It informed a complainant that her account of her own capacity would not be credited by the agency reviewing her complaint, in the same call in which that agency closed the complaint, declined to accept her evidence, identified no appeal, and refused to put any of it in writing.

427. As a direct and proximate result, Plaintiff was excluded from participation in and denied the benefits of the agency's services, programs, and activities, and suffered emotional distress and the loss of the ability to pursue her complaint.

## <u>COUNT XV</u>

## SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794

(Against Defendant Chad Chronister, in his official capacity as Sheriff of Hillsborough County)

428. Plaintiff realleges and incorporates paragraphs 1 through 301 as though fully set forth herein.

429. The Hillsborough County Sheriff's Office is a program or activity receiving federal financial assistance within the meaning of 29 U.S.C. § 794(b).

430. Plaintiff is an individual with a disability who is otherwise qualified to participate in the agency's programs and activities.

431. Plaintiff was excluded from participation in, denied the benefits of, and subjected to discrimination under those programs and activities solely by reason of her disability, in the manner alleged in Count XIV.

432. Defendant acted with deliberate indifference to Plaintiff's federally protected rights.

433. As a direct and proximate result, Plaintiff suffered the injuries described above.

## **COUNT XVI**

SPOLIATION OF EVIDENCE — SANCTIONS UNDER FED. R. CIV. P. 37(e) AND THE COURT'S INHERENT AUTHORITY

(Against All Defendants)

434. Plaintiff realleges and incorporates paragraphs 1 through 301 as though fully set forth herein.

435. Body-worn camera recordings, computer-aided dispatch records, evidence-system audit trails, access histories, deletion logs, and related electronically stored information are electronically stored information that should have been preserved in the anticipation and conduct of this litigation.

436. Defendants' duty to preserve arose on or about August 5, 2023, when Plaintiff expressly asked Defendant Sergeant John Doe to keep and preserve the body-worn camera footage for her and told him she would return to the matter when she was well enough to do so. That was a direct preservation request, made to a supervising member of the agency, within days of the incident, identifying the exact category of evidence at issue and the reason it was wanted.

437. The duty arose again, independently and unmistakably, upon each of Plaintiff's public records requests, upon her recovery and escalation request to the body-worn camera records unit, upon the filing of her Professional Standards complaint, and upon her express written preservation demands of July 15 and July 18, 2026.

438. Defendants therefore destroyed this evidence after being asked in August 2023 to keep it, and after being asked again, in writing, on multiple later occasions. This is not a case of records lapsing before anyone thought to ask for them.

439. Defendants failed to take reasonable steps to preserve that information. At least seven body-worn camera video files were lost, destroyed, purged, or permitted to be overwritten.

440. The information cannot be restored or replaced through additional discovery, and Defendants have affirmatively refused to attempt recovery from archives, backups, cloud storage, or audit trails.

441. Defendants acted with the intent to deprive Plaintiff of the information's use in this litigation. The destruction occurred after notice, the agency has refused to identify when or by whom it occurred or under what authority, the agency simultaneously represented that the destroyed evidence had been thoroughly reviewed, and the agency has refused to attempt recovery even after being asked directly to do so.

442. The pretextual character of the destruction is established by the agency's own stated reason for it. The Sheriff's Office invoked a two-year simple-battery limitations period to justify purging the recordings, when the injuries its own personnel observed describe felony battery under Fla. Stat. § 784.041 and aggravated battery under Fla. Stat. § 784.045, both governed by the three-year period of Fla. Stat. § 775.15(2)(b) that does not expire until August 4, 2026. The agency destroyed the evidence of a still-prosecutable felony and characterized it as the routine purge of a lapsed misdemeanor.

443. The destruction additionally deprived Plaintiff of the ability to determine what the responding deputies said to one another and to the persons present, and therefore of the ability to determine whether any impermissible motive, including racial animus, informed their conduct. Defendants may not destroy the record of their own statements and then invoke Plaintiff's resulting inability to describe those statements as a defense.

444. The destroyed recordings contained the agency's own copies of Plaintiff's video of the assault, which responding deputies played aloud into their body-worn cameras at the scene. Plaintiff no longer possesses the original recording, having lost the telephone during the period of incapacity that followed the injury. The destruction therefore eliminated the only surviving video record of the assault itself, and not merely the record of Defendants' conduct.

445. Plaintiff is prejudiced. The destroyed recordings are the single category of evidence that would independently establish the conduct of the responding deputies, the identity of the deputies present, the delay of medical transport, the search of the vehicle and purse, the surrender of the premises, and the harassment of Plaintiff on the gurney.

446. Plaintiff is entitled to sanctions under Fed. R. Civ. P. 37(e)(2) and the Court's inherent authority, including a presumption that the lost information was unfavorable to Defendants, an instruction that the jury must or may presume the destroyed recordings would have established Defendants' misconduct, the striking of Defendants' defenses, and the entry of default judgment on liability.

447. Plaintiff further alleges that the conduct described in this Count constitutes the knowing falsification, concealment, alteration, and destruction of official records and public documents by public servants with corrupt intent, as defined by Fla. Stat. § 838.022, and the failure to maintain public records as required by Chapter 119, Florida Statutes, and pleads those violations as evidence of bad faith and corrupt intent bearing on the sanctions sought.

## COUNT XVII

## DECLARATORY JUDGMENT — 28 U.S.C. §§ 2201–2202

(Against Defendant Chad Chronister, in his official capacity as Sheriff of Hillsborough County)

448. Plaintiff realleges and incorporates paragraphs 1 through 301 as though fully set forth herein.

449. An actual and justiciable controversy exists between Plaintiff and Defendant concerning the legality of Defendant's conduct and the continuing obligations owed to Plaintiff.

450. Plaintiff is entitled to a declaration that Defendant violated Article I, Section 2 of the Florida Constitution by interfering with her right to acquire, possess, and protect property and to defend her own life and safety; Article I, Section 12 by conducting a warrantless search of her vehicle and purse without any valid exception; Article I, Section 16(b) (Marsy's Law) by failing to protect her, as a crime victim, from intimidation, harassment, and abuse throughout the law enforcement process, including by permitting her assailant to stand over her and scream at her while she was restrained on a gurney in the presence of six deputies, and by failing to inform her of and afford her the rights guaranteed to victims; and Article I, Section 21 by destroying and

falsifying the records necessary for her to obtain redress in a court that the Florida Constitution requires to be open to her.

451. Plaintiff is further entitled to a declaration that the destruction of the body-worn camera recordings violated Chapter 119, Florida Statutes, and that the expiration of a criminal limitations period conferred no authority to destroy them.

452. Plaintiff is further entitled to a declaration that Defendant's refusal to identify an ADA coordinator, to publish a grievance procedure, and to engage in any interactive process violates 28 C.F.R. §§ 35.107 and 35.160.

## XI. RESERVATION OF FLORIDA TORT CLAIMS

453. Plaintiff has served written notice of claim under Fla. Stat. § 768.28(6) upon the Hillsborough County Sheriff's Office and upon the Florida Department of Financial Services, Division of Risk Management.

454. Plaintiff's Florida common-law and statutory tort claims — including battery by omission, false imprisonment, intentional infliction of emotional distress, negligent hiring, retention, supervision and training, operational negligence, civil trespass, and conversion — are subject to the statutory 180-day investigation period and are therefore not pleaded in this Complaint.

455. Plaintiff expressly reserves those claims and will move for leave to amend to add them upon the earlier of a written denial of the claim or the expiration of the 180-day period.

Reservation of Race-Based Claims Pending Discovery

456. Plaintiff expressly reserves, and gives notice under Fed. R. Civ. P. 11(b)(3) that she will assert upon a reasonable opportunity for further investigation and discovery if the evidence supports it, the following additional claims arising from racial discrimination:

457. (a) Denial of equal protection of the laws on the basis of race, in violation of the Fourteenth Amendment and actionable under 42 U.S.C. § 1983, on the theory that one or more Defendants treated Plaintiff differently from Torres Figueroa, and favored Torres Figueroa over Plaintiff, because of Plaintiff's race.

458. (b) Conspiracy to deprive Plaintiff of the equal protection of the laws motivated by racial animus, in violation of 42 U.S.C. § 1985(3).

459. (c) Denial of the full and equal benefit of all laws and proceedings for the security of persons and property as enjoyed by white citizens, and impairment of Plaintiff's contractual and leasehold rights, in violation of 42 U.S.C. § 1981. Plaintiff acknowledges that as against state actors the exclusive federal remedy for a violation of § 1981 is 42 U.S.C. § 1983, and any such claim will be asserted through that vehicle.

460. (d) Neglect or refusal to prevent a racially motivated conspiracy, in violation of 42 U.S.C. § 1986.

461. Plaintiff states plainly that she does not presently possess evidence that any Defendant acted from racial animus, and she does not plead that any Defendant did. She states equally plainly that she cannot exclude it, and that the reason she cannot exclude it is that Defendants destroyed the body-worn camera recordings that would have shown what the responding deputies said, to whom, and why.

462. The known facts that make the inquiry a proper subject of discovery rather than speculation are these: Plaintiff's assailant used a Spanish-language racial epithet against Plaintiff during the incident; the responding deputies aligned themselves with the assailant and against Plaintiff in every decision they made at the scene; a deputy declined to take any statement from Plaintiff while devoting her entire presence to the assailant; and the recordings that would resolve whether race played any part in those choices were destroyed by the agency after Plaintiff demanded their preservation.

463. Plaintiff will seek in discovery the identity of every responding deputy, all personnel and assignment records, all communications among the responding deputies concerning this incident, any relationship between any Defendant and Torres Figueroa, and all recoverable fragments, backups, audit entries, and metadata of the destroyed recordings. Plaintiff will move promptly for leave to amend if that discovery supports any claim reserved in this section, and asks that the destruction of the evidence be weighed against Defendants, and not against Plaintiff, in any assessment of the sufficiency of these reservations.

**The Escalations Plaintiff Made Before She Contacted Any Federal Agency**

464. Plaintiff made four separate escalation requests to the Hillsborough County Sheriff's Office. Each was made to a different person. Each produced a promise that the matter would be carried upward. Not one of them produced a result, and Plaintiff never heard back from any of them.

465. First. On or about August 5, 2023, Plaintiff spoke by telephone with Defendant Sergeant John Doe. She described what the responding deputies had done, asked him to document her concerns, and asked him expressly to keep and preserve the body-worn camera footage. He told her he had reviewed everything and would do nothing further. He told her he would save the records and reports for her. He told her that the only avenue available to her was to bring a civil action against the person who had assaulted her.

466. That answer is the foundation of everything that followed. A supervising sergeant of the agency told Plaintiff, within days of the incident, that she had reached the end of what the agency was going to do. Plaintiff took him at his word, because she had no reason not to.

467. Second. Plaintiff went in person to the Hillsborough County Sheriff's Office at 2008 East 8th Avenue in Ybor City to collect the records she had requested. She was handed a file that was nearly empty and told there were no reports. She explained what had happened. The records employee told Plaintiff she was shocked, told her she was sending the matter upward to Internal Affairs on her own initiative, and gave Plaintiff the telephone number for the Professional Standards Bureau. Other employees present observed the exchange. Nothing ever came of it, and no one from Internal Affairs contacted Plaintiff as a result.

468. Third. Plaintiff telephoned the body-worn camera records unit and spoke with the employee named in this action as Defendant Records Custodian Jane Doe. She recounted the entire matter, asked that it be carried up the chain of command, told the employee she had already requested an escalation process and received nothing, and asked that the employee's supervisor contact her. She asked that the recording of that call be forwarded to the supervisor. The employee undertook to consult her supervisor and told Plaintiff she would send the form required to request retrieval of the deleted footage. No form was ever sent. No supervisor ever contacted Plaintiff by telephone, by email, or by letter.

469. Fourth. Plaintiff asked Defendant Corporal Hendricks, the assigned Professional Standards investigator, to escalate the matter to someone above her. Corporal Hendricks told Plaintiff there was no escalation procedure and that the case was closed. That request was made verbally, during the telephone call of July 20, 2026, and after Plaintiff had already told Corporal Hendricks that she had been to the Federal Bureau of Investigation.

470. Plaintiff contacted the Federal Bureau of Investigation only after the first three of those requests had produced nothing, and only after a supervising sergeant of the Hillsborough

County Sheriff's Office had told her directly that the agency would take no further action and that suing her assailant was the only thing left to her.

471. Plaintiff went to the Tampa field office of the Federal Bureau of Investigation in person. Her attendance is recorded in that office's visitor record, and Plaintiff asks that the record be obtained. She did not telephone and she did not write. She went.

472. The agent Plaintiff spoke with told her that the matter was not qualified for federal involvement at that time, and that the procedure was to bring it first to Internal Affairs and then to the Attorney General. He told her she had not filed a formal Internal Affairs request. Plaintiff followed that instruction precisely. She returned to the agency and filed the Professional Standards complaint assigned Reference ID 01KX7R4DJ8-QZM5JWZP-TYAQWW9N.

473. The agent also told Plaintiff that processes exist for the retrieval of digital evidence at this stage of a matter, and that he had firsthand knowledge of those processes. Plaintiff conveyed that to the Hillsborough County Sheriff's Office. The agency's later position — that the recordings are not retrievable and that there is no system on which they are stored — was taken after Plaintiff had told it, from a federal source and from her own professional background in information technology, that the premise was doubtful.

474. Plaintiff pleads this sequence because a reader coming to it cold might conclude that she went over the agency's head before exhausting its own procedures. She did not. She went to a federal agency because a supervisor of that agency had told her there was nothing further it would do. When she was told she had missed a step, she went back and took it. Every escalation route the agency made available to her, she used, in order, and each one ended with a person promising to carry the matter upward and no evidence that anyone ever did.

475. Plaintiff does not represent that any federal investigation is open, and none of the relief sought in this action depends on one.

**Reservation of Matters Plaintiff Cannot State Because Defendants Destroyed the Evidence**

476. There are things about August 4, 2023 that Plaintiff does not state in this Complaint, and there is one reason for that. Defendants destroyed the recordings.

477. Plaintiff does not plead what the body-worn camera recordings show. She does not plead that they show misconduct and she does not plead that they do not. She has never been

permitted to see them. She neither asserts nor concedes their contents, and she asks this Court to place the consequence of that silence on the party that created it.

478. Plaintiff was refused evidence at every office she asked. The public records process returned a nearly empty file. The body-worn camera records unit told her no footage existed and never sent the retrieval form it promised. The Professional Standards Bureau told her the footage had been thoroughly reviewed, then told her one day later that it no longer exists, then refused to attempt recovery, refused to identify when or by whom it was deleted, refused to accept the audio recordings Plaintiff offered, and refused to reopen the file. Plaintiff served written preservation demands on July 15 and July 18, 2026 and received no response to either.

479. Plaintiff therefore expressly reserves, and gives notice under Fed. R. Civ. P. 11(b)(3) that she will assert upon a reasonable opportunity for further investigation and discovery, any claim, allegation, or theory that the recovered or reconstructed evidence supports — including matters she cannot presently identify, because the records that would identify them are either in Defendants' exclusive possession or were destroyed by Defendants.

480. That reservation extends to, without limitation: the identities of the deputies who responded; what those deputies said to one another and to the persons present, and the reasons they gave each other for the decisions they made; whether any responding deputy, supervisor, dispatcher, or records employee had any personal, familial, social, or prior professional relationship with Jessica Torres Figueroa; whether any impermissible motive informed any decision made at the scene; the date each recording was deleted, the authority relied upon, and the person who authorized and the person who executed it; what the two announced reviews consisted of, if either occurred; what the emergency communications records show and how they differ from the narrative the agency assembled; and what remains recoverable from archives, backups, cloud storage, audit trails, metadata, thumbnails, proxies, and vendor systems.

481. A party that destroys the record of an event does not acquire, by that destruction, the benefit of the other party's resulting inability to describe it. Plaintiff asks that every gap in this Complaint traceable to the destroyed evidence be weighed against Defendants and not against Plaintiff, and that she be permitted to amend promptly under Rule 15 as that evidence, or any part of it, is recovered.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff ANGIE L. BOONE respectfully requests that this Court:

a. Enter judgment in favor of Plaintiff and against Defendants on all Counts;

b. Award compensatory damages against all Defendants, jointly and severally, in an amount to be determined by the jury, for physical injury, traumatic brain injury, medical expense, past and future pain and suffering, emotional distress, humiliation, loss of liberty, loss of property, loss of her business, loss of income and earning capacity, and the loss of her constitutional right of access to the courts;

c. Award punitive damages against each individual Defendant in his or her individual capacity, in an amount sufficient to punish and deter, on the ground that each acted in bad faith, with malicious purpose, and in wanton and willful disregard of Plaintiff's rights, safety, and property, thereby forfeiting the protection of Fla. Stat. § 768.28(9)(a) and exposing personal assets to any judgment entered;

d. Enter a declaratory judgment as set forth in Count XVII; e. Enter injunctive relief requiring Defendant Chronister to: (i) immediately preserve all remaining records, files, logs, audit trails, metadata, backups, archives, and cloud-stored data relating to the events of August 4, 2023 and to Professional Standards Complaint Reference ID 01KX7R4DJ8-QZM5JWZP-TYAQWW9N; (ii) conduct and document a full forensic recovery attempt of the destroyed body-worn camera recordings through the agency's digital-evidence, information-technology, and vendor resources, and produce a sworn certification of the results; (iii) identify by name, rank, and badge number every deputy, supervisor, dispatcher, and records employee involved in each of the four calls for service and in the subsequent Professional Standards investigation; (iv) reopen Professional Standards Complaint Reference ID 01KX7R4DJ8-QZM5JWZP-TYAQWW9N and assign it to a reviewer outside the Professional Standards chain of command; (v) correct the false report designated GOH HS 2023-808016; and (vi) designate and publish an ADA coordinator and grievance procedure, and provide Plaintiff the written-communication accommodation she requested;

f. Impose sanctions for spoliation of evidence under Fed. R. Civ. P. 37(e)(2) and the Court's inherent authority, including a jury instruction that the destroyed body-worn camera recordings would have established Defendants' misconduct, the striking of Defendants' defenses, and the entry of default judgment on liability;

g. Enter judgment establishing that the Hillsborough County Sheriff's Office and its Professional Standards Bureau, as institutions, are answerable for the conduct pleaded here, and that each individual Defendant, having acted in bad faith and with wanton and willful disregard, is answerable personally and as to personal assets;

h. Order Defendants to produce a sworn accounting of every body-worn camera recording generated in connection with the events of August 4 through August 7, 2023, including the date each was created, the date and manner of any deletion, the person who authorized and the person who executed it, and every audit-trail, access-history, and metadata record reflecting who viewed or handled each file; i. Award Plaintiff her costs of suit, litigation expenses, and any fees recoverable by a prevailing party under 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794a;

j. Award pre-judgment and post-judgment interest at the maximum rate allowed by law;

k. If the Court concludes upon the evidence that a referral is warranted, refer the matter of the destruction of public records to the State Attorney for the Thirteenth Judicial Circuit and to the United States Attorney for the Middle District of Florida, a determination Plaintiff leaves entirely to the Court's discretion; and

l. Grant such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution, Plaintiff ANGIE L. BOONE demands a trial by jury on all issues so triable.

Respectfully submitted,
Angie L. Boone
Plaintiff, pro se
7853 Gunn Highway, Suite 101
Tampa, Florida 33626
Telephone: 813-294-6440
Email: angie1006@yahoo.com Dated: August 3, 2026

# COMPLAINT UNDER TITLE II OF THE AMERICANS WITH DISABILITIES ACT

August 3, 2026

United States Department of Justice Civil Rights Division Disability Rights Section — 4CON 950 Pennsylvania Avenue, NW Washington, DC 20530

RE: Title II Complaint Against the Hillsborough County Sheriff's Office, Florida Complainant: Angie L. Boone

## I. Complainant

1. Angie L. Boone, 7853 Gunn Highway, Suite 101, Tampa, Florida 33626. Telephone 813-294-6440. Email angie1006@yahoo.com. I am an individual with a disability. I have an impairment that substantially limits major life activities including concentrating, thinking, communicating, and neurological and brain function, and I have a record of that impairment.

II. Public Entity Complained Of

2. Hillsborough County Sheriff's Office, 2008 East 8th Avenue, Tampa, Florida 33605. Sheriff Chad Chronister. The agency is a public entity under 42 U.S.C. § 12131(1) and a recipient of federal financial assistance under 29 U.S.C. § 794.

III. Program or Activity

3. The agency's Professional Standards Bureau complaint process, its public records process, and its communications with complainants and crime victims.

IV. What Happened

4. I filed a Professional Standards complaint with the Hillsborough County Sheriff's Office, assigned Reference ID 01KX7R4DJ8-QZM5JWZP-TYAQWW9N. It was assigned to Corporal Kristin Hendricks #249576.

5. On July 15, 2026, I requested in writing that the agency identify its ADA coordinator and its reasonable accommodation process, and that it communicate with me in writing, provide a designated point of contact, confirm receipt of my submissions, explain conflicting information in writing, and allow reasonable additional time to respond. I asked that the request be made part of the complaint record. I received no response of any kind.

6. On July 18, 2026, I renewed the request in writing. I again received no response.

7. On July 20, 2026, Corporal Hendricks telephoned me rather than replying in writing. She stated at the outset that she would not communicate by email. During that call I told her directly that I was having difficulty communicating, that I have difficulty saying exactly what I mean verbally, and that it would be easier for me if I could read it — which is why I had asked more than once for written communication.

8. The substance of her response was that I was not having trouble, that I could communicate with her perfectly well, and that I did not need an ADA accommodation. She made that determination herself, on the call, without any interactive process, without reference to any policy, and without consulting anyone.

9. I then asked for accommodation assistance. I asked to escalate the matter to someone else. I asked her to confirm the closure of my complaint in writing so that I would have it. She refused all three.

10. The result was that the entire disposition of my complaint was conducted through a single unrecorded twenty-two-minute telephone call, in the one format I had told the agency I cannot use, while the agency refused to put anything in writing.

11. To date the Hillsborough County Sheriff's Office has never identified an ADA coordinator, never identified or provided a grievance procedure, never engaged in any interactive process, never issued any written determination on my request, and never provided the modification I asked for.

V. Violations Alleged

12. Failure to designate a responsible employee and to adopt and publish grievance procedures, 28 C.F.R. § 35.107.

13. Failure to make reasonable modifications in policies, practices, and procedures necessary to avoid discrimination on the basis of disability, 28 C.F.R. § 35.130(b)(7)(i).

14. Affording an opportunity to participate in and benefit from a service that is not equal to that afforded others, 28 C.F.R. § 35.130(b)(1)(ii).

15. Utilizing methods of administration that have the effect of subjecting a qualified individual with a disability to discrimination, 28 C.F.R. § 35.130(b)(3).

16. Imposing eligibility criteria that screen out an individual with a disability from full and equal enjoyment of a service, 28 C.F.R. § 35.130(b)(8).

17. Failure to ensure effective communication, 28 C.F.R. § 35.160.

18. Denial of the benefits of, and exclusion from participation in, the services, programs, and activities of a public entity by reason of disability, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

VI. Relief Requested

19. An investigation of the Hillsborough County Sheriff's Office's compliance with Title II, including whether it has designated an ADA coordinator and adopted and published grievance procedures as required.

20. A directive that the agency provide me the written-communication accommodation I requested and reopen my complaint through a process I can actually use.

21. Such compliance review, technical assistance, or enforcement action as the Department determines appropriate. VII. Other Proceedings

22. I have this date filed a civil rights action in the United States District Court for the Middle District of Florida, Tampa Division, which includes claims under Title II and Section 504 arising from these facts. I have not filed this complaint with any other federal, state, or local agency. I authorize the Department to disclose the contents of this complaint as necessary to investigate it.

Respectfully submitted,
Angie L. Boone
Complainant
7853 Gunn Highway, Suite 101
Tampa, Florida 33626
Telephone: 813-294-6440
Email: angie1006@yahoo.com
Dated: August 3, 2026